# Richmond

M. J. PUTNAM, COMMONWEALTH'S ATTORNEY, ET ALS. V.
A. C. FORD.

November 13, 1930.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

*W. W. Martin* and *Henry R. Miller, Jr.,* for the plaintiffs in error.

*J. W. C. Johnson,* for the defendant in error.

Holt, J., delivered the opinion of the court.

On August 31, 1928, A. C. Ford, a citizen of Clifton Forge, filed in the circuit court there his petition praying that the State of Virginia refund certain taxes collected by it under an erroneous assessment for the year 1927. In due course and on February 4, 1929, an order was entered which sustained his claim and which directed that there be paid back to him by the State the sum of $1,485.48.

On May 31, 1929, the State Tax Commissioner, Mr. C. H. Morrissett, appeared on behalf of the Commonwealth and asked that a rehearing be granted in accordance with the provisions of section 411 of the Tax Code of Virginia (Code Supp. 1928, page 368).

This rehearing was granted, but on November 9, 1929, the trial court reaffirmed its order of February 4, 1929, and again gave judgment for Ford in said sum of $1,485.48, which judgment the State, through its proper officers, was ordered to pay. This last judgment is now before us on a writ of error.

From Ford's petition it appears that he had purchased through the Hot Springs office of Logan and Bryan, brokers, whose principal place of business was in New York city, certain stock on margin, the fair market value of which was $458,735. On account of these purchases he had paid $161,639, so that there was still due from him by reason thereof, $297,096.

On its merits, the trial court was of opinion that Mr. Ford should have been required to pay taxes on his interest in this stock only, or on $161,639, and that he should not have been required to pay taxes on $297,096, that being the difference between the amount actually paid and its fair market value. In other words, it was of opinion that

Ford had no interest in this stock beyond what he had paid by way of margins and was not its owner. The contention of the Commonwealth is that Ford had bought it and should be taxed with its fair market value—that is to say, it contends that he who purchases stock on margin is its owner, just as he would be the owner of any other property purchased and paid for in part only, and should pay taxes on its full value.

Before we come to consider the merits of this controversy, certain preliminary objections must be met.

█ It is said that there is no proper bill of certificate of exceptions identifying the testimony in this case. Rule XXIV of the rules of this court (prior to the amendment effective June 16, 1930) provided that evidence must be authenticated or verified by the trial court, or judge thereof, within sixty days (now seventy days) after final order, and while this rule is remedial in character and should be liberally construed, this authentication or verification is still necessary. Whether or not it has been complied with in the instant case, we are not called upon to decide, for all facts necessary to a decision on its merits already appear in the record, and are set out in the petition, the petition for rehearing and in the orders thereon. They make the issue entirely clear. If Ford is the owner of this stock, the judgment must be reversed; if he has no interest in it beyond his actual payments on account, then it must stand. There is no question as to amount. He is either entitled to be paid in full the sum which it evidences, or to receive nothing on his claim. All of this appears independent of the testimony of any witness, and so it is not necessary that this evidence be incorporated into any bill or certificate of exceptions. It will not be considered.

It is next said that the plaintiff in error is not entitled to appeal from the final order on rehearing, and was not entitled to be heard on a rehearing. Judgment on the

original petition was entered as of February 4, 1929. The court in its order said: "And the said State Tax Commissioner having intimated his intention to apply to the Supreme Court of Appeals of Virginia for a writ of error and supersedeas, it is ordered that this order be suspended for a period of three months from this day."

Petitioner claims that section 411 of the Tax Code, on its face, gives to the Commonwealth the right either to appeal from a judgment on his original petition or the right to appeal from a judgment on its petition to rehear, but not both; and that in the instant case the Commonwealth having made its election as indicated in the suspending order, was estopped afterwards to change its position, and could not afterwards file any petition to rehear.

The intention here expressed was not carried out. The State Tax Commissioner, upon reflection, concluded to file a petition for rehearing rather than to prosecute an appeal from the first order. He might have done either and in either event he had six months from the date of final judgment in which to apply for a writ of error. Section 411 of the Tax Code provides in part as follows: "And should the order of the court, either upon the original hearing or upon the rehearing, be against the Commonwealth, the State Tax Commissioner may take an appeal to the Supreme Court of Appeals, and a supersedeas may be granted in each case in the same manner as now provided by law in cases other than cases of appeals of right."

This, in substance, has long been the law. Code 1919, section 2391; *Commonwealth* v. *Schmelz*, 114 Va. 364, 76 S. E. 905.

Judgment at the rehearing was entered on November 9, 1929. To it a writ of error was allowed as of April 7, 1930, and in ample time.

We have here two consistent remedies. The State, in the first instance, seems to have intended to apply im-

mediately for a writ of error, but afterwards, for reasons satisfactory to itself, abandoned that purpose and tendered its petition to rehear. There is nothing in the record to show that Mr. Ford was in the slightest degree injured by this shift of position, and as Judge Keith observed, in *Smith's Ex'or* v. *Powell*, 98 Va. 431, 36 S. E. 522, 524: "It is of the essence of estoppel that the act relied upon as such should have been injurious and to the prejudice of him who relies upon it as estoppel."

"In that class of cases in which the remedies are not inconsistent but are alternative and concurrent, there is no election until one of them has been prosecuted to judgment, unless the plaintiff has gained an advantage, or the defendant has suffered a disadvantage. In some of the cases in this class it has been determined that there is no estoppel until satisfaction has been obtained." 9 R. C. L. 961.

The statute itself is entirely reasonable. Motions for the correction of erroneous assessments sometimes touch upon matters of wide importance. In such cases, State officials whose particular duty it is to protect public interests should be given an opportunity to be heard, not only on appeal, but in the trial court, if a rehearing, upon reflection, is deemed advisable. Certainly, here this procedure has injured no one.

It is also contended that section 411 of the Tax Code "is discriminatory, in that it accords to the Commonwealth as a matter of right the absolute right to have such a case reheard, leaving in the judge of the lower court no discretion as to granting or refusing the prayer of such a petition, but making it mandatory upon and absolutely requiring the lower court to grant the rehearing. Thus giving to the State Tax Commissioner an absolute right which is denied to all of its citizens, and thereby according to the said Tax Commissioner, instead of what is usually termed as his day in court, not only a first but also a second

day in court; a second bite at his cherry; a proceeding heretofore unheard of and denied to the applicant, the defendant in error."

The contention is that section 411 of the Tax Code contravenes Article XIV, section 1, of the Federal Constitution, which provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Section 410 of the Tax Code (Code Supp. 1928, page 367), makes adequate provision for the correction of erroneous assessments, and that is all that the taxpayer can demand. He has also that general right of appeal which is accorded to litigants at large. Section 411 provides that the State may ask a rehearing as a matter of right and may appeal as a matter of right. The reasons for this distinction have already been adverted to. One hearing is all that the taxpayer can, in any event, demand.

*Pittsburgh, etc., Ry. Co.* v. *Backus*, 154 U. S. 421, 14 S. Ct. 1114, 1117, 38 L. Ed. 1031, is quite in point. It was there held that where ample opportunity was given railroads to be heard before the final assessment of their properties they could not complain because an additional hearing was given ordinary taxpayers. A single hearing was due process and that was enough. Mr. Justice Brewer said: "Equally fallacious is the contention that, because to the ordinary taxpayer there is allowed not merely one hearing before the county officials, but also a right of appeal with a second hearing before the State board, while only the one hearing before the latter board is given to railroad companies in respect to their property, therefore the latter are denied the equal protection of the laws. If a single hearing is not due process, doubling it will not make it so; and the power of a State to make classifications in

judicial or administrative proceedings carries with it the right to make such a classification as will give to parties belonging to one class two hearings before their rights are finally determined, and to parties belonging to a different class only a single hearing. Prior to the passage of the court of appeals act by Congress, in 1891, a litigant in the circuit court, if the amount in dispute was less than $5,000, was given but a single trial and in that court, while if the amount in dispute was over that sum the defeated party had a right to a second hearing and in this court. Did it ever enter into the thought of any one that such classification carried with it any denial of due process of law?"

The State may make all reasonable classifications, as clearly appears from Mr. Justice McKenna's opinion in *United States* v. *Heinze*, 218 U. S. 532, 31 S. Ct. 98, 102, 54 L. Ed. 1139, 21 Ann. Cas. 884, where he said: "It is contended by the defendant that the act of March 2, 1907, is not applicable to the case, because the right it offers is 'wholly unilateral.' 'It opens the door of this court,' it is said, 'to the United States as one party to the cause only, and denies the same privilege to the defendant.' The ultimate contention is that defendant is thereby denied the equal protection of the laws. This inequality is asserted because the United States is given an appeal to this court, and before trial, and a defendant is only given right of review in the Circuit Court of Appeals, and only at the end of the trial. The defendant is put to expense and peril, it is urged, though the indictment against him may be wholly bad, 'and is at every stage of the case forbidden the right of review upon any question in the Supreme Court, except the construction or application of the Constitution or the constitutionality of any Federal statute.' And this, it is insisted, is the denial of due process of law as well as the denial of the equal protection of the laws. We shall not follow the somewhat round about argument

to establish the identity of those two rights. If we should yield to the argument, it would necessarily follow that if defendant has not been denied due process he has not been denied the equal protection of the law, and this court has decided that the right of appeal is not essential to due process of law. *Reetz* v. *Michigan*, 188 U. S. 505, 508, 23 S. Ct. 390, 47 L. Ed. 563, 566. The provisions have definite application, and even if the explicit clause of the fourteenth amendment, forbidding a State to deny to any person within its jurisdiction the equal protection of its laws, can be said to apply to the United States, it can have no broader meaning when so applied than when applied to the States. Assuming, therefore, and assuming only, not deciding (see *District of Columbia* v. *Brooke*, 214 U. S. 138, 149, 29 S. Ct. 560, 53 L. Ed. 941, 945), that Congress may not discriminate in its legislation, it certainly has the power of classification, and the act of March 2nd is well within such power."

"The State may classify broadly the subjects of taxation, but in doing so it must proceed upon a rational basis. The State is not at liberty to resort to a classification that is palpably arbitrary. The rule is generally stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Ohio Oil Co.* v. *Conway, Supervisor of Public Accounts* (decided April 14, 1930), 281 U. S. 146, 50 S. Ct. 310, 314, 74 L. Ed. 775.

As we have already seen, even a casual consideration of this statute makes it clear that the State and taxpayers are in widely different classes and that their separation into them is neither arbitrary nor unreasonable. When the taxpayer has once been fully heard, he can gain nothing by being reheard. On the other hand, the State at times has little more than constructive notice of the pendency of the litigation; that it may be fully protected it has seen

fit to appoint an officer for the purpose, skilled in the law of taxation. Certainly he should be heard. This much the State may prescribe as a prerequisite for relief.

■ Mr. Ford cannot complain of this procedure for another reason—he has no right to recover taxes paid voluntarily unless he is given that right by statute.

In *Fox* v. *Edwards* (C. C. A.), 287 Fed. 669, 671, an attempt was made to recover a voluntary payment of income taxes paid under a mistake. The court, in the course of its discussion, said: "And the rule of the Federal courts is not at all peculiar to them. It is the settled general rule of the State courts, as well, that, no matter what may be the ground of the objection to the tax or assessment, if it has been paid voluntarily and without compulsion, it cannot be recovered back in an action at law, unless there is some constitutional or statutory provision which gives to one so paying such a right, notwithstanding the payment was made without compulsion."

See also *Bank of Kentucky* v. *Stone* (C. C.), 88 Fed. 383, opinion by Judge Taft.

In *Prescott* v. *City of Memphis*, 154 Tenn. 462, 285 S. W. 587, 48 A. L. R. 1378, it was held that a payment without protest of taxes assessed under an unconstitutional statute is voluntary, though the taxpayer did not in fact know that the statute was unconstitutional, and that being voluntary it could not be recovered. 26 R. C. L., section 411.

Again, the judgment in this case is against the State and is not made the less so because the mandate runs against the Comptroller and the Treasurer. *Smith* v. *Reeves*, 178 U. S. 436, 20 S. Ct. 919, 924, 44 L. Ed. 1140.

In that case it was held that where a State consents to be sued by a complaining taxpayer, it may prescribe reasonable conditions to be observed. The opinion ends with this restatement of one of the fundamental principles of our government: "The suability of a State without its consent was a thing unknown to the law. This has been

so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted. * * * 'It may be accepted as a point of departure unquestioned,' said Mr. Justice Miller, in *Cunningham* v. *Macon and Brunswick Railroad*, 109 U. S. 446, 451, 3 S. Ct. 292, 609, 27 L. Ed. 992, 994, 'that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution.'"

See also *Town of Leesburg* v. *Loudoun National Bank*, 141 Va. 244, 126 S. E. 196, and *Commonwealth* v. *Deford Co.*, 137 Va. 551, 120 S. E. 281.

In the absence of some permissive statute, a taxpayer, however grievous his wrong, circumstanced as is Mr. Ford, could not be heard to complain at all—not against officials for his payment was voluntary, and not against the State, for it, with certain exceptions not necessary to be noted here, cannot be sued at all. Having been granted this privilege, he cannot complain because the State has hedged it about with reasonable provisions designed for its own protection. A man is not obliged to accept a gift, but, as a matter of right, he must take it or leave it.

Having emerged from this barrage of preliminary objections, we come to the merits of this case. How and against whom must stock purchased on margin be taxed?

In the tax bill of 1926, Schedule C, section 8, sub-section 5, class 5 (Acts 1926, chapter 576, page 958) the State undertakes to tax: "All shares of stock of corporations or joint stock companies except such corporations and joint stock companies all of whose capital is taxed by this State, or which pay a franchise tax in this State, and banks, banking associations, trust and security companies, and insurance companies which are otherwise taxed in this State."

It will be observed that no provision is here made for deductions of any character.

As bearing upon the general policy of Virginia, it is pertinent to note that under the tax bill of April 16, 1903, Schedule C, section 8, copied (as amended) in the Code of 1919, page 3079, a taxpayer was permitted to deduct from the aggregate amount of his bonds, notes and other evidences of debt, all bonds, demands, or claims, due by him as principal debtor to others. This privilege was expressly abolished in an amendment to the tax bill, passed in 1922, Acts 1922, page 551, chapter 332. It is now plain that the purchaser of a bond who has not paid for it in full must still be taxed as its owner with its market value. *Robertson* v. *Commonwealth*, 128 Va. 107, 105 S. E. 215; *Bridgewater Mfg. Co.* v. *Funkhouser*, 115 Va. 476, 79 S. E. 1074. And so, by parity of reason, the owner of stock should be taxed on the same basis whether he has paid for it in full or not.

When stock is bought on margin, the customer indicates to his broker that which he desires to purchase and the price, and at the same time deposits with him a certain percentage of its cost.

A leading case upon the rights and liabilities of broker and purchaser is *Markham* v. *Jaudon*, 41 N. Y. 235. Their reciprocal relations are thus summarized: "The broker undertakes and agrees:

"1. At once to buy for the customer the stocks indicated;

"2. To advance all the money required for the purchase beyond the ten per cent furnished by the customer;

"3. To carry or hold such stocks for the benefit of the customer so long as the margin of ten per cent is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer and not of the broker;

"4. At all times to have in his name or under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock;

"5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker, or,

"6. To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale.

"Under this contract the customer undertakes—

"1. To pay a margin of ten per cent on the current market value of the shares;

"2. To keep good such margin according to the fluctuations of the market;

"3. To take the shares so purchased on his order whenever required by the broker, and to pay the differences between the percentage advanced by him and the amount paid therefor by the broker."

In Jones on Pledges, section 496, it is said: "The broker acts in a threefold relation: First, in purchasing the stock he is an agent; then in advancing money for the purchase he becomes a creditor; and, finally, in holding the stock to secure the advances made, he becomes the pledgee of it. It does not matter that the actual possession of the stock was never in the customer. The form of the delivery of the stock to the customer, and a redelivery by him to the broker, would have constituted a strict, formal pledge. But this delivery and redelivery would leave the parties in precisely the same situation they are in when, waiving this formality, the broker retains the certificates as security for the advance."

In the leading case of *Richardson* v. *Shaw*, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, it was held that a broker who carries stock on margin is

essentially a pledgee, and not the owner of the stock. *Markham* v. *Jaudon, supra,* was there approved.

This case is particularly interesting by reason of the fact that Mr. Justice Holmes, as Chief Justice of the Supreme Judicial Court of Massachusetts, had, in *Chase* v. *City of Boston,* 180 Mass. 458, 62 N. E. 1059, delivered an opinion in which he held that the broker was the owner of the stock. He adverts to that fact in a concurring memorandum in *Richardson* v. *Shaw,* where he says that though he still entertains some lingering doubt, he presumes that he must have been wrong in the *Chase Case.*

██ "Though there are cases expressing a different view, we think it established by the great weight of authority that the customer buying on margin becomes owner of the stock, although the broker who has purchased it for him can hold it as a pledge for advances made in obtaining it. *Austin* v. *Hayden,* 171 Mich. 38, 137 N. W. 317, 322, Ann. Cas. 1915B, 894.

This statement of the law is abundantly supported. *Blankenhorn-Hunter-Dulin Co.* v. *Thayer,* 199 Cal. 90, 247 Pac. 1088, 48 A. L. R. 797; *Duel* v. *Hollins,* 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143; *Lamprecht* v. *State,* 84 Ohio St. 32, 95 N. E. 656; *Sproul* v. *Sloan,* 241 Pa. 284, 88 Atl. 501, Ann. Cas. 1915B, 941; *Skiff* v. *Stoddard,* 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102; *United Nat. Bank* v. *Tappan,* 33 R. I. 1, 79 Atl. 946; *Sackville* v. *Wimer,* 76 Col. 519, 233 Pac. 152, 41 A. L. R. 1255; *Sargent* v. *Whitfield & Co.,* 226 Ky. 754, 11 S. W. (2d.) 926; Cook on Corp. (6th ed.), section 457; 4 R. C. L., page 279, section 27; 9 C. J., page 542; Bouvier's Law Dict. (Rawle's 3d ed.), Margins.

██ It is true that no stock certificate is issued directly to the purchaser, but that, in any event, is only *prima facie* evidence of title. One who buys stock owns it, though no

certificate is ever issued, and title does not go up in smoke if it chances to be burnt. It is a chose in action, not paid for in full, and held by the broker as security for such advances as he may have made on its account.

This is not the law in Massachusetts (*Chase* v. *City of Boston, supra*), which has steadily adhered to the doctrine that title is in the broker and not in the customer. *Pizer* v. *Hunt*, 253 Mass. 321, 148 N. E. 801; *Papadopulos* v. *Bright*, 264 Mass. 42, 161 N. E. 799. And this appears to be the English rule. *Bentinck* v. *Bank* (1893), 2 Chy. 120, 140, 141.

In *Tunis' Ex'or* v. *Tormey*, 1 Va. Dec. 487, the court cites *Markham* v. *Jaudon, supra,* and seems to adopt the New York rule, although the exact question now before us was not then up for decision. It does seem to say that the New York case would have been followed under a like state of facts.

In *Miller & Co.* v. *Lyons*, 113 Va. 275, 74 S. E. 194, an instruction was approved which dealt with the customer and broker as pledgor and pledgee. This view is sustained, as we have seen, by the heavy weight of authority, and so we have no difficulty in reaching the conclusion that Mr. Ford owned the stock which he listed, and that the only interest which his brokers had therein as agent for him was a lien for advancement.

In the consideration of this case we have proceeded upon the theory that the evidence was not sufficiently identified. All that we can learn from the petition to rehear and the decrees thereon is that Ford bought this stock through a broker's office at Hot Springs. It is true that these brokers maintain their principal office in New York, and it is probable that the orders of purchase were executed on the New York stock exchange, but this is surmise only. Whether a certificate covering this stock purchase, when bought,

was sent to the Hot Springs, or kept in New York, we do not know, but we do know that Ford was a citizen of Virginia, and as such was taxed with stock which he then owned, whether it had been pledged as security for a debt elsewhere or not.

The judgment against the Commonwealth must be set aside, and the proceedings out of which it arose dismissed. It is so ordered.

*Reversed.*