# Richmond

POLLARD & BAGBY, INC. V. MORTON G. THALHIMER, INC.

January 13, 1938.

Present, Campbell, C. J., and Holt, Gregory, Eggleston
and Spratley, JJ.

530

The opinion states the case.

*Montague & Montague* and *Dave E. Satterfield, Jr.,* for the appellant.

*Christian, Barton & Parker,* for the appellee.

HOLT, J., delivered the opinion of the court.

This is a suit brought by one real estate agent against another to compel division of commissions on the sale of a home near Richmond.

The issue, in short form, is this: Plaintiff, Morton G. Thalhimer, Incorporated, contends that it had a customer, Dr. C. C. Coleman, who desired to purchase a home, and that the defendant, Pollard & Bagby, Incorporated, had for sale a home known in the record as the "Finlayson Home"; that these two corporations, working through their respec-

tive agents, Lester D. Wallerstein and C. I. Arnall, agreed to pool their efforts and to divide commissions if a sale to Coleman could be effected, and that as a result of their joint efforts this Finlayson home was finally sold to Dr. Coleman. Plaintiff now demands an accounting. Defendant claims that any agreement theretofore made had long expired before there was any sale, and that it was in fact finally made through its own unaided efforts.

The original bill of complainant was filed in the Circuit Court of the city of Richmond at the second November rules, 1933.

At the first December rules, 1933, defendant filed its demurrer and answer.

In the demurrer it was said that, if the plaintiff had any valid claim at all, it was legal and not equitable.

On March 20, 1934, plaintiff filed its motion for judgment against the defendant in the Law and Equity Court of the city of Richmond, Part II. In this motion the same facts were relied upon to sustain a recovery that were set out in the bill. This common-law action was tried before a jury on July 20, 1934. There was a mistrial, the jury being unable to agree, and that case was continued.

On October 15, 1935, the defendant moved that the chancery suit be dismissed on the ground that a common-law action had been instituted based upon the same state of facts. That motion by decree was on that day overruled. The court in overruling this motion said: It is "ordered, adjudged and decreed that the plaintiff herein do make an election, forthwith, as to which proceeding it shall elect not to prosecute against the defendant, and that the plaintiff herein after making such election forthwith dismiss and discontinue such proceeding as it shall elect not to prosecute."

Thereupon, on October 15, 1935, plaintiff filed its amended bill, which the defendant answered. On December 14, 1936, this cause came on to be heard upon depositions and exhibits. The chancellor being of opinion that these parties were engaged in a joint adventure and that the equities

were with the plaintiff so decreed, and ordered that the plaintiff recover from the defendant $2,187.50, with interest from November 1, 1933.

In plaintiff's bill and amended bill, it is charged that in 1931, the plaintiff, acting through its agent, Lester Wallerstein, entered into a verbal agreement with C. I. Arnall, agent for the defendant, whereby it was agreed that they should work together in an effort to sell to Dr. C. C. Coleman, a prospect of the plaintiff, a valuable dwelling on the western edge of the city of Richmond, known as the Finlayson house and lot, on the Cary Street Road, in Henrico county, which property was then listed with the defendant for sale. In the event that such a sale was perfected, commissions were to be equally divided. The joint efforts of these two salesmen to perfect this sale were continued, and finally resulted in the purchase by Coleman of this property in October, 1933. The commissions from this sale the defendant has declined to divide.

Plainly equity had jurisdiction, as appears from the cause of *Horne* v. *Holley*, 167 Va. 234, 188 S. E. 169, 171, where this subject received careful consideration at the hands of Eggleston, J., and where many authorities are collected. He quotes with approval these statements of the law:

" 'A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." ' 33 C. J., page 841, section 1; *Dexter & Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 651.

"The obligations *inter se* of persons engaged in a joint adventure are similar to those existing between partners. The relation is one of mutual trust and confidence. The utmost good faith, the most scrupulous honesty, is exacted of each party toward the other. Each must guard the interest of his coadventurer equally with his own, and must make a frank and full disclosure of all material facts.

Each is regarded by a court of equity as a trustee or agent of the other with respect to the enterprise to be undertaken.

" 'Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated.' 33 C. J., pages 851, 852, section 36. See also, 15 R. C. L., page 501, section 3; *Dexter & Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 652; *Maas* v. *Lonstorf* (C. C. A. 6), 194 F. 577; *Meinhard* v. *Salmon*, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, and note."

The demurrer was properly overruled.

These proceedings are both consistent and inconsistent—consistent in that full relief might flow through either channel; inconsistent in that plaintiff can be compensated but once.

By instituting its action at law, it concedes that the law court also might give to it complete and adequate relief. Can it bring a suit in chancery, and before any action is taken thereon, institute an action at law on the same state of facts, where both courts have power to give complete and adequate relief; and if so, can an election be ordered, and when must it be made?

The mere institution of double-barrel litigation is not necessarily an election.

"If a suit in equity and an action at law between the same parties and touching the same subject matter are pending at the same time, the court of equity, upon the application of the defendant, should compel the complainant to elect which he will prosecute." *Keys Planing Mill Co.* v. *Kirkbridge*, 114 Va. 58, 75 S. E. 778, headnote by Judge Burks; *Priddy* v. *Hartsook*, 81 Va. 67; *Zetelle* v. *Myers*, 19 Gratt. (60 Va.) 62.

In *Sangster & als.* v. *Commonwealth,* 17 Gratt. (58 Va.) 124, the court said:

"When A wrongfully takes the property of B and sells it, B may bring trespass, trover, detinue or assumpsit for money had and received, against A at his election; but having elected one of these forms of action, and prosecuted it to judgment, he cannot then abandon it and bring another." From which it follows that a second action might have been instituted had the first not yet been brought to final judgment.

In *Richmond, etc., R. Co.* v. *New York, etc., R. Co.,* 95 Va. 386, 28 S. E. 573, 576, Keith, P., said:

"As to what act constitutes an election is the subject of conflict among the adjudicated cases. By some it is held that the bringing of the suit is an election; by others that the suit must be prosecuted to judgment, and by yet a third class that the judgment must be satisfied. We are not called upon to discuss, far less reconcile, these cases."

▆ The authorities cited appear to indicate that the institution of an action at law, after the bringing of a chancery suit, does not constitute an election, and this conclusion appears to be supported by the weight of authority elsewhere. 9 R. C. L., p. 961, and Permanent Supplement, vol. 4, p. 2579. Plaintiff itself appears to have recognized this and contends not that the institution of the common-law action was an election but that it "by instituting and prosecuting the action at law * * * (it) had thereby elected to prosecute and proceed to a final determination of its said claim in said action at law."

▆ Of course, there can be but one satisfaction for one cause of action.

If the second rule suggested by Judge Keith is to be adopted unmodified, then there has been no election because the common-law action progressed to a mistrial and not to a judgment.

Judge Moncure appeared to be of opinion that a final judgment is necessary, and Judge Keith thought that it was at least necessary if the mere institution of the common-law

action was not conclusive. See also, *Gibson* v. *Finley,* 4 Md. Ch. 75 at page 80; *American Process Co.* v. *Florida, etc., Brick Co.,* 56 Fla. 116, 47 So. 942, 944, 16 Ann. Cas. 1054; *McGunn* v. *Hanlin,* 29 Mich. 476, 480; *Knott* v. *Seamands,* 25 W. Va. 99.

In *Putnam* v. *Ford,* 155 Va. 625, 155 S. E. 823, 824, 71 A. L. R. 1217, we cited with approval this statement of the law from 9 R. C. L., p. 961:

"It is of the essence of estoppel that the act relied upon as such should have been injurious and to the prejudice of him who relies upon it as estoppel.

"In that class of cases in which the remedies are not inconsistent but are alternative and concurrent, there is no election until one of them has been prosecuted to judgment, unless the plaintiff has gained an advantage, or the defendant has suffered a disadvantage. In some of the cases in this class it has been determined that there is no estoppel until satisfaction has been obtained."

The doctrine of election is founded upon estoppel, and estoppel itself is an equitable rule. Intervening equities might work an estoppel, although it had not been in terms ordered.

In *Register* v. *Carmichael,* 169 Ala. 588, 53 So. 799, 800, 34 L. R. A. (N. S.) 309, it is said:

"But an election, to be conclusive, must be efficacious to some extent at least. The mere bringing of a suit is not determinative of the right. The party against whom the estoppel is pleaded must have received some benefit under his election." "Or have caused some detriment to the other party." Note 34 L. R. A. (N. S.), *supra.*

In *First Nat. Bank* v. *Flynn,* 190 Minn. 102, 250 N. W. 806, 808, 92 A. L. R. 1272, the court said:

"Putting aside the cases where any affirmative act indicating a choice (*e. g.,* submission generally to the jurisdiction of the court) is of necessity held an irrevocable election, it is a safe premise that a party should not be bound by an election unless he has pursued the chosen course to a determinative conclusion or has procured ad-

vantage therefrom, or has thereby subjected his adversary to injury. Many cases hold that the mere commencement of an action is conclusive evidence of election."

In *Becker* v. *Walworth,* 45 Ohio St. 169, 176, 12 N. E. 1, 4, it was said:

"It is not necessary to undertake to lay down any general rule, as to election, by which all cases should be governed. Indeed, it is apparent that no general rule can be given, but that every case must be left to be decided upon its own particular circumstances." See also, *Frederickson* v. *Nye,* 110 Ohio St. 459, 144 N. E. 299, 35 A. L. R. 1163.

In the instant case the plaintiff has received no benefit from the common law trial and the defendant has lost no right, although he has been put to the trouble and expense which it necessitated. Beyond this, there is nothing to indicate that Pollard & Bagby were injured by this shift in position. *Putnam* v. *Ford, supra.* All that we know is that there was a common-law mistrial. That record is not before us. It was had on July 19 and 20, 1934, and it was not until October 15, 1935, that there was any suggestion of the defense now relied upon.

We do not think that the bare fact that there was a common-law mistrial constitutes an estoppel.

From the day on which the common-law action was instituted the defendant below could have compelled an election, and when requested, on October 15, 1935, it was properly promptly ordered.

We are thus brought to the merits of this cause heard on depositions and exhibits.

In these circumstances, what weight is to be given to the chancellor's decree?

In *Pryor* v. *East,* 150 Va. 231, 142 S. E. 361, 362, the court said:

"The chancellor, upon this question of fact, held with the complainants and it is well settled that where the court below has, upon the evidence, determined a question of fact, the appellate tribunal will not overturn its decision,

except where there is manifest error or misconduct. *Womack* v. *Tankersley,* 78 Va. 242."

The latest expression of this court on that subject appears in *Morison* v. *Dominion Nat. Bank, ante,* p. 191, 192 S. E. 707, 713, where we said:

"In *Swetnam* v. *Antonsanti,* 150 Va. 534, 143 S. E. 716, 719, Campbell, J., cited with approval this statement of the law made by Judge Prentis in *White* v. *Reed,* 146 Va. 246, 254, 135 S. E. 809:

" 'The burden which is cast upon the appellant in this court is not merely to lodge a doubt, but to satisfy this court of the error assigned. It would be going too far, perhaps, to say that error must be demonstrated, for that might be construed to imply mathematical precision, but certain it is that an opinion reversing a judgment should convince the impartial mind.'

"This statement we again approve."

Wallerstein, plaintiff's agent, said that he was told by his friend, Dr. Whitehead, in 1931 that Dr. Coleman wished to purchase a home and might be interested in that owned by Mr. Finlayson, which was upon the market. He then went to see Coleman, who was but mildly interested, and said that his wife would have to be consulted. Thereafter he called up Mr. Finlayson by telephone and was told that he would have to consult with Mr. Arnall, with whose company this property had been listed. Thereafter he got in touch with Mr. Arnall, who came to his office. To him the situation was explained, and it was suggested that they unite in an effort to effect this sale to this prospect. Arnall said that he would be delighted to co-operate and that if they succeeded commissions were to be equally divided. There was no written contract between them and no limit as to the time within which this joint adventure was to continue. He did not know that the defendant had any written option; he never saw it until October 18, 1933, when the Coleman sale had actually been made, which was on October 7, 1933.

Mrs. Coleman was immensely pleased with the Finlayson house, but she and her husband, as a part of a possible purchase, wished to trade in their Ginter Park home and certain properties in Gloucester county. To this Mr. Finlayson was unwilling to agree. The efforts of these two men to make a sale to Coleman then came to a standstill.

There was then listed with the plaintiff two other homes in Richmond, the Evans home and Hodges home. Wallerstein said:

"Immediately the Finlayson home faded out of the picture I told Mr. Arnall of these two homes and told him I would take him up to introduce him to Mr. Evans who owned 'Blue Shingles' and we would go up and talk to him and see whether he might be interested in making the deal with Dr. Coleman." This was in the spring of 1932.

Commissions on either of them, had a sale been effected, were in like manner to be divided. Nothing was accomplished and so matters again came to a standstill.

He also associated Arnall with him in an attempt to sell certain property in Glen Allen, which undertaking also came to naught.

Arnall told him of the sale to Gray and said that he was sorry that they had been unable to sell to the Colemans. Wallerstein asked him, "Would Mr. Gray be willing to make a deal with Dr. and Mrs. Coleman?" and was told that Gray was satisfied with his purchase and wanted to keep it. He further testifies that:

"During the summer of 1933 Mr. Arnall came into my office. He was in his shirt sleeves and came right up to my desk and sat down and said, 'Lester, I am working on a deal in which you are interested.' I said, 'Well, if I am interested, tell me more about it.'"

He then said that Gray had called him up and had explained to him for reasons satisfactory to himself, he then wished to sell the home which he had theretofore bought through him, and suggested he see what could be done with the Colemans. Arnall then saw Wallerstein and suggested that he, through certain channels of approach which he

had, should find out how the Colemans then stood. This Wallerstein did and reported back to Arnall. Arnall took the matter up with them and reported progress to Wallerstein from day to day. Wallerstein took no part in their conferences, although he offered to do so; this because Arnall thought it would be unwise to appear too aggressive, and that he, Arnall, through his relationship with the Colemans, could handle the matter to a better advantage. Then it was that Wallerstein offered to take Arnall in on the attempt to sell the Glen Allen property. Later Arnall told him, "I have signed the Grays and Colemans up to a deal." "* * * I said 'That is the end of a long trail for us,' and thereupon he said, 'Wallerstein, I want to tell you that I am not going to count you in on any of these commissions.' " He said that Arnall, "acted as a full-fledged partner with me on the transaction all the way through up to the day he told me that he was not going to count my office in on any of the commissions."

Arnall said that they had the exclusive written right to sell this Finlayson property, in a written option of date June 24, 1931, which expired at twelve, noon, on September 30th of that year; that a number of real estate agents in Richmond came to see him about this matter, among them Wallerstein, who said that he had a prospect, and was then shown the written option which he read. He told him that they might work together during its life, all of which was thoroughly understood. Dealings relative to the Evans and Hodges properties were had during that period, and it was within it that the Colemans finally decided that they were not interested. He further testified that his services were invoked in the Glen Allen transaction because one Gill who was interested was not on good terms with the plaintiff. He further testified, and this is not questioned, that the sale to Gray on March 7, 1933, was brought about through his unaided efforts. This purchaser, after occupying his home for three or four months, decided to sell, called up the witness, gave him his reasons for his purpose, and placed the property in his hands, saying: "I will give you

thirty days to sell this property to Dr. Coleman." He did go to see Coleman and succeeded in effecting a sale to him. This sale was through his unaided efforts and with it Wallerstein had "nothing whatsoever" to do. Arnall further testified: After the sale was made Wallerstein "came in my office and asked me— said 'I understand you have sold this property to the Colemans.' I said, 'Yes.' He said, 'I am in on it, you know.' I said, 'No, I don't recognize you at all in this.' And then what was said, I don't know, but he got rather infuriated and went back and talked to Mr. Bagby, and there was no conversation from that time on between he and I. The conversation was between he and Mr. Bagby."

Without further elaboration, this witness states in unequivocal terms that he had no agreement with Wallerstein whatever about the Finlayson property except that made when the latter came to his office in 1931, which agreement was to continue for and to expire with the life of the option, or in September of that year.

Real estate agents familiar with customs generally accepted in Richmond have testified both for the plaintiff and for the defendant. Upon hypothetical questions, those for the plaintiff say that upon Wallerstein's statement of facts it is entitled to recover; those for the defendant say that upon Arnall's he is not. Plainly there is room for doubt.

One can well believe that the undertaking first made to sell to the Colemans was at least at an end when Arnall sold to Gray. But Wallerstein has testified that he and Arnall thereafter continued their joint efforts to sell to the Colemans and as a final result did sell to them.

The jury, upon evidence which must have been substantially the evidence here, could reach no agreement. The judge below, an able chancellor of wide experience, was of opinion that the equities were with the plaintiff. Since we are not "convinced" that he is wrong, his decree must stand, and it is so ordered.

*Affirmed.*