# Richmond

## M. Osborne Jones v. Galleher & Company, Inc.

April 26, 1948.

Record No. 3311.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Staples, JJ.

The opinion states the case.

*Christian, Barton, Parker & Boyd* and *Chas. Killian Woltz,* for the appellant.

*M. Wallace Moncure, Jr.,* and *Brockenbrough Lamb, Jr.,* for the appellee.

BUCHANAN, J., delivered the opinion of the court.

On this appeal Jones, the appellant, asserts a right to one-half of $46,175.87 of profits made by Galleher & Company, Inc., on 4,464 shares of preferred stock, Series B, of Duplex Envelope Company, herein referred to as Duplex.

Jones is the son of the founder of Duplex, which engaged principally in the manufacture of church envelopes, and after the death of his father he became its chief executive officer. The company encountered financial difficulties,

and in 1933 receivers were appointed for it by a State court. Jones was one of the receivers. In 1936 it went into reorganization proceedings in a Federal court under the National Bankruptcy Act and Jones was one of its trustees.

In 1937, after the reorganization proceeding, Jones was an officer of the company but he did not get along with the other trustees and his services were dispensed with. A little later his salary was discontinued and his resignation as a director was accepted. He then was the owner of voting trust certificates for 4,250 out of 5,138 outstanding shares of the common stock of the company, together with a right to 10,000 additional shares of common stock which were to be issued to him upon retirement of certain securities issued under the plan of reorganization. In 1940 and 1941 his 4,250 shares were hypothecated and had no market value. He was heavily in debt, had no employment and was dependent for his living on what he could borrow from those willing to lend to him.

In these circumstances, Jones became very desirous of effecting the refinancing of Duplex in order that he might terminate the voting trust in effect under the plan of reorganization and regain control of the company as its majority stockholder.

He finally succeeded in interesting Mr. James E. Galleher, president of Galleher & Company, Inc., the appellee (both herein called Galleher), a corporation engaged in the underwriting of securities. On August 1, 1940, a contract was entered into between Jones and that company by which Galleher agreed to make an offer to Duplex to purchase certain new issues of bonds and stocks in the amount of $375,000, on terms stated in the contract. In consideration thereof, Jones agreed, among other things, to use his best efforts to purchase at a discount of at least $75,000, approximately $180,000 par value of Duplex outstanding preferred stock, Series B, and to assign and deliver it to Duplex without profit to himself; and also to obtain written consents from the holders thereof to exchange at

least $70,000 par value of old preferred stock for new preferred stock to be issued under Galleher's refinancing plan.

The contract specified that time was of its essence and that Jones should have until September 10, 1940, to furnish satisfactory evidence of his ability to perform his undertakings; and if so furnished, Galleher agreed forthwith to make its offer to Duplex to buy the bonds and the new preferred stock; but if not furnished, then all the obligations of Galleher would immediately end, and also Galleher's obligations were likewise to end unless the bonds and stock so to be purchased by Galleher from Duplex were delivered to Galleher on or before December 1, 1940, but with the right reserved by Galleher to extend that time for an additional period of not more than 90 days.

Pursuant to that contract, Jones succeeded in buying from the receivers of American Bank and Trust Company 8,928 shares of Duplex preferred stock, Series B, par value $20, for $90,000, on terms of $23,568 cash and $66,432 payable January 5, 1941. To enable Jones to get the money to make the cash payment, Galleher endorsed Jones' note to out-of-town banks, and unconditionally guaranteed the note of Jones to the receivers for the deferred payment, with which the 8,928 shares were deposited as collateral.

The contract of August 1, 1940, had omitted to state what would be done with the 8,928 shares of stock if Galleher's refinancing offer to Duplex was not accepted, but on September 6, 1940, Jones wrote to Galleher that he was confirming the agreement made at the time Galleher assisted him in purchasing the 8,928 shares from the receivers, and stating:

"It was agreed between us at that time, which agreement I now confirm, that in the event for any reason you are unable to complete the financing of Duplex Envelope Company, Incorporated, as contemplated and provided for in our agreement, and it becomes necessary to sell the aforesaid stock and same is sold at a profit, the said profit shall be divided between ourselves equally, after deducting there-

from any expenses incurred in connection with the purchase, the carrying and the sale of said stock."

Jones had not procured the consents for the exchange of the $70,000 old preferred stock of Duplex for the new at September 10, 1940, the time limit fixed by the August 1 contract; nor had he done so at December 1, 1940, the maximum date on which the new bonds and stocks were to have been delivered to Galleher, and, consequently, Galleher's plan of refinancing had not been submitted to Duplex.

By letter of December 13, 1940, from Galleher's counsel to Jones' counsel, the former, on Galleher's behalf, exercised the option reserved by Galleher in the August 1 contract and extended the time for the delivery of the bonds and stocks to March 1, 1941, and called attention to the fact that Jones had not complied with his undertaking to obtain the written consents for the exchange of the preferred stocks.

That letter referred to Galleher as the Underwriter and stated: "This of course is an essential element of the contract, but the Underwriter (without waiving any of its rights under the contract) is now endeavoring to assist Jones in obtaining such consents."

By the first of January, 1941, it had become obvious that the refinancing plan would not be put through by the due date (January 5, 1941) of the $66,432 note made by Jones and guaranteed by Galleher to the receivers for the 8,928 shares of preferred stock. Galleher discussed the matter with Mr. Overton Dennis, who indicated a willingness to render financial assistance. A series of conferences were held, beginning soon after January 1, attended at various times by Galleher and Powell, his attorney; by Jones and Hazelgrove, his attorney, and by Dennis. As a result, on January 6, 1941 (January 5 being Sunday), Galleher paid the note with money obtained on a note for $68,004.22 made to and endorsed by Dennis, with the 8,928 shares as collateral.

On January 8, 1941, two days later, contracts, which had

been worked out in the conferences, were signed—one between Galleher and Jones and the other between Galleher and Dennis. The one between Galleher and Jones recited that at the request of Jones, Galleher had paid the note to the receivers and had taken title to the 8,928 shares of stock. It confirmed the agreement of Galleher to pay the two notes of Jones aggregating $25,951.52 due February 1, 1941, given to obtain the money for the cash payment on the purchase of the 8,928 shares; and the agreement of Galleher to resell these shares as a whole to Jones at any time on or before March 1, 1941, at cost plus $6,000, but providing that if Jones purchased them in connection with the Duplex refinancing plan Galleher would waive the $6,000.

This contract provided that if Jones did not exercise this option to repurchase, then Galleher would own the 8,928 shares free and clear of any and all rights and claims of Jones, and further stipulated:

"This agreement supersedes any and all agreements written or oral between you and us, or any member of our firm, except the underwriting agreement of August 1, 1940, which has been extended to March 1, 1941, in accordance with a letter dated December 13, 1940, from our counsel to your counsel."

The agreement between Galleher and Dennis recited that Galleher owned the 8,928 shares subject to the option of Jones, and Dennis agreed, if Jones did not exercise his option, to purchase on March 3, 1941, one-half, or 4,464, of said shares at their average cost to Galleher, estimated to be $11 a share, and to lend Galleher up to $50,000 for three years, secured by the 4,464 shares retained by Galleher, and to finance or assist Galleher in financing the carrying of the 8,928 shares from January 6, 1941, to March 3, 1941, to the extent of lending to or endorsing for Galleher the principal sum of $68,004.22, the amount that had been paid to the receivers to take up Jones' note.

The consents to the exchange of the preferred stocks were finally secured and on February 18, 1941, Jones sub-

mitted to Duplex Galleher's refinancing offer, which was rejected on February 26, 1941, on a tie vote by its directors. Jones did not repurchase the 8,928 shares by March 1, and on April 11, 1941, they were transferred on the books of Duplex to Galleher and Dennis—one-half to each. Galleher afterwards sold his 4,464 shares in small blocks at various dates up to March 15, 1946, at a profit of $46,175.87.

In May, 1943, Jones brought this suit charging in effect that his agreement of January 8, 1941, to release his rights to one-half of the profits on the 4,464 shares was obtained by Galleher by fraud and deceit, and praying that Galleher be required to account for the profits and that Jones have judgment for his part.

Evidence was heard *ore tenus* by the trial court, which entered its decree on March 19, 1947, holding that a joint adventure had been entered into between Galleher and Jones, which had been materially amended by the contract of January 8, 1941; that this contract superseded all previous contracts, and had been voluntarily entered into after all material facts had been considered and discussed between all parties interested, and that no fraud or undue influence had been exercised, all of which had been established by the defendant by a preponderance of the evidence. The court held, therefore, that after March 1, 1941, Galleher and Dennis became complete owners of the 8,928 shares, denied the relief prayed for by Jones and dismissed his bill.

Jones has assigned seven errors to that decree, six of which assert that the trial court should have rescinded the contract of January 8, 1941, because the evidence showed it was procured in violation of duties owed by Galleher to Jones resulting from a fiduciary and confidential relationship which existed between them by reason of their joint adventure; that it had been procured by fraudulent representations and in circumstances of business duress; and because Galleher had failed to establish by clear and convincing evidence that it had been fairly and justly procured. Galleher assigned cross-error to the holding

that the agreements between Galleher and Jones established a joint adventure.

"'A joint adventure has been aptly defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation."' 33 C. J., page 841, section 1; *Dexter & Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 651." *Horne* v. *Holley*, 167 Va. 234, 239, 188 S. E. 169, 171. See also, *Pollard & Bagby* v. *Thalhimer, Inc.*, 169 Va. 529, 194 S. E. 701; *Chisholm* v. *Gilmer*, 4 Cir., 81 F. (2d) 120.

Here the original contract between the parties was in consideration "of the mutual advantages to be derived by the proposed new financing" of Duplex. The main objective of the parties was this refinancing from which Galleher expected to profit by the purchase of the bonds and stocks and Jones expected to profit by regaining control of the company, by being named as a director and securing employment by it, and also by coming into possession of the 10,000 shares of its common stock to which he had conditional title.

Admittedly an essential element in the success of the refinancing plan was the acquisition of the 8,928 shares of preferred stock. Jones undertook to buy these shares as well as to secure written consents for the exchange of the old for the new preferred stock. Galleher contracted to assist Jones in buying the stock by guaranteeing payment (conditionally under the August 1 agreement, and unconditionally under a subsequent agreement of August 16) of the $66,432 note to the receivers due January 5, 1941. Additional consideration for this agreement by Galleher was 2,000 shares of the unissued 10,000 shares of Duplex common stock under the August 1 agreement, increased to 3,000 shares under the August 16 agreement. Beyond the terms of his contract with Jones, Galleher also endorsed unconditionally the notes of Jones to the out-of-town banks to get the cash payment for this stock. Then, by their agreement of September 6, 1940, Galleher and Jones agreed

to share any profits from a resale of the 8,928 shares so acquired by their joint efforts.

The evidence was sufficient to show a joint adventure between Galleher and Jones to accomplish the ultimate end of refinancing Duplex, and the decree of the trial court so holding was without error.

"The obligations *inter se* of persons engaged in a joint adventure are similar to those existing between partners. The relation is one of mutual trust and confidence. The utmost good faith, the most scrupulous honesty, is exacted of each party toward the other. Each must guard the interest of his coadventurer equally with his own, and must make a frank and full disclosure of all material facts. Each is regarded by a court of equity as a trustee or agent of the other with respect to the enterprise to be undertaken." *Horne* v. *Holley, supra,* at p. 239.

Coadventurers stand in a fiduciary relation to each other, and within the scope of the enterprise they are bound by the same standards of good conduct and square dealing as are required between partners. *Horne* v. *Holley, supra.*

The scope of the enterprise as to which they must exercise good conduct and square dealing is, however, to be found in their contract. Their duties within that area are mutual and reciprocal. Each is to perform his contractual obligations in the utmost good faith and with scrupulous honesty. But even between coadventurers the law of contracts remains in force. If one fails to perform a material element of his agreement, it is still permitted to the other to make with him a new agreement, provided he does so honestly and in good faith after a frank and full disclosure of all material facts.

The trial court, after hearing and seeing the witnesses, held that to be the case here. We test the validity of that ruling by well-settled principles. Its finding stands upon the same plane as a jury verdict and settles the conflicts in the evidence. It cannot be disturbed unless it is plainly wrong or without evidence to support it.

"The finding of the trial court upon an *ore tenus*

hearing where the evidence is conflicting compels us to accept that upon which the finding was based unless it is incredible and unworthy of belief. It is equivalent to the finding of a jury upon conflicting evidence in so far as our review is concerned. For the later cases, see Digest of Va. & W. Va. Reports (Michie), Vol. 1, Perm. Supp., pp. 167-176." *Nix* v. *Nix*, 186 Va. 14, 20, 41 S. E. (2d) 345, 347.

Viewed in this light, the evidence in this record establishes that Galleher went into this matter "purely to do a piece of financing," and told Jones from the very beginning that he did not want to tie up his capital or credit with this financing, and Jones was well aware of that fact. Throughout the whole transaction Jones had access to Galleher's files at all times up to August, 1941, a year after the first contract was made. Galleher entered into the contract largely at the instance of Mr. Hazelgrove, Jones' attorney and a lawyer of recognized standing and ability. Mr. Hazelgrove prepared the letter of September 6, 1940, providing for the division of profits from the 8,928 shares of stock. He was also present at several of the conferences leading up to the execution of the agreement of January 8, 1941, and he approved that contract before Jones signed it.

That contract was the result of several days and many hours of conferences and discussions by and among Galleher and his attorney, Jones and his attorney, and Mr. Dennis.

Around the first of December, 1940, Jones inquired of Galleher about what was going to happen to the note to the receivers which would become due on January 5, and Galleher told him there would not be any trouble about the note being paid. Later in December Galleher realized they could not get the financing through by January 5, and Jones was again in Galleher's office to inquire what was going to be done and Galleher told him he had discussed the matter with Mr. Dennis, who would be interested in buying part of the 8,928 shares of stock, and that he could secure the money from Dennis to take up the note. After

talking again with Dennis, Galleher told Jones that Dennis wanted to buy half of the stock, but if he bought it he did not want to give up any profits if there were any. Galleher also discussed the matter two or three times with Jones' attorney.

Right after January 1 there was a conference among Galleher, Jones and Dennis, when all the details of the matter were thoroughly discussed. At a further meeting on Saturday, January 4, there was a full discussion of the proposition that Dennis was to get fifty per cent of the stock and finance Galleher on the rest. In addition to Galleher, Jones and Dennis, the attorneys for Galleher and Jones were also present at that conference. Mr. Powell testified, "The basic agreement, as I recall, was hammered out on that long Saturday afternoon conference on the 4th of January when all of the participants were present at one time or another, as I recall."

There appear in the evidence the unsigned drafts of two contracts prepared by Mr. Powell as a result of that conference, one dated January —, 1941, and the other dated January 6, 1941, both in the form of letters addressed to Galleher, to be signed by Dennis and approved by Galleher and Jones. Both set forth an agreement that Dennis would furnish the money to pay the note to the receivers and take down the 8,928 shares of stock, half of which would be purchased by Dennis and the other half by Galleher by means of financial assistance from Dennis, with provision for resale of both blocks to Jones.

The draft dated January 6 bears a notation in the handwriting of Powell, "This was never executed, all parties being in agreement except as to par. 5." That paragraph related to further time to consummate the plan of refinancing Duplex, the right of repurchase by Jones, and a provision that if that right was not exercised Dennis and Galleher would be complete owners of the stock free from any claims by Jones. Powell testified that this paper was the subject of a conference, which he thought was attended by all the parties interested, "which included

Mr. James Galleher, Mr. Overton Dennis, Mr. Osborne Jones, Mr. Hazelgrove and myself."

He further testified that it was his recollection that this January 6 draft was what the parties had agreed to on Saturday, January 4, and were going to execute on Monday, January 6, but that later Dennis preferred to have an agreement with Galleher in which Jones was not a party. He was testifying from his records and said he was satisfied that the substance of that draft was satisfactory to all parties involved; that he was confident that all the parties understood the substance of this agreement and that he understood they had agreed to it. Mr. Powell later drew the agreement of January 8, which he said he wanted to be the final word between Jones and Galleher on all the transactions that involved Duplex.

Galleher emphatically denied that during any of those conferences, or at any time, he told Jones, as Jones had testified, that he could not procure the money to pay the note due the receivers on January 5, as the source to which he had looked had failed him; but that, on the contrary, he told Jones then, as he had from the beginning, that he did not want to tie up his credit in this type of stock, and that that was the reason for getting Dennis into the matter. He testified that he told Jones everything that went on. He told Jones that Dennis was buying half the stock outright and that he (Galleher) had been working on this thing for a long time, had put a lot of work into it and he did not see why he should be asked to do more than Dennis would do, and Jones made no objection to that.

The evidence clearly establishes that the contract of January 8, 1941, which by its terms superseded all contracts between these parties, was voluntarily entered into by Jones after all material facts had been discussed. All the way through he had the advice of his counsel, who approved the contract before Jones signed it, and who was present at the conferences which preceded the drafting of the agreement.

Jones' version of the matter was unconvincing. He testified that on January 2 Galleher told him he could not pay the note to the receivers and "there wasn't any chance to get any refinancing before the directors;" that Galleher then mentioned the possibility of getting the money from Dennis, to which Jones replied, "Well, for goodness sake, let us see Mr. Dennis and see if we can get it." He testified that he went to see Galleher next day, January 3, and Galleher told him he felt reasonably certain he could work out a deal with Dennis, but not for any division of the profits in case the stock had to be sold; that he (Jones) replied that he would waive division of the profits, but that he understood Galleher to mean by this that there would not be any profits on the stock for either one of them and that if there were any, Dennis would get them all; but that this was not specifically stated by Galleher and was simply an inference on Jones' part.

He claimed that the first he knew of Galleher's contract with Dennis was after he signed the contract with Galleher and he asked Galleher to let him read it. He said he did not then protest, but that he did not like it, but "realized that the only chance to get the thing refinanced in any way at all was to keep Mr. Dennis in the thing and he would undoubtedly get out of it if any argument developed between Mr. Galleher and myself as to our understanding of what was to be done;" that he was hopeful that the Galleher refinancing plan would be accepted by Duplex and that eventually he would have a chance to get the stock back. He said that on January 6 he went with Galleher, Dennis and Powell to the bank, but he did not know what happened there. That was the occasion when the money was obtained on Galleher's note endorsed by Dennis to pay off the note to the receivers for the 8,928 shares.

He was asked if he was influenced to make the contract of January 8 by the statement of Galleher that he had no means to pay the $66,432 note, and he replied, "I wouldn't

have waived my repurchase right if he hadn't made that statement." What he meant by that is not clear. The fact is, he did not waive any repurchase right in the January 8 contract, and that contract was signed two days after the note to the receivers was paid off by Galleher, and at a time when he said he was still hopeful that the Galleher refinancing plan, which would require Galleher to buy $375,000 of stocks and bonds, would go through.

Aside from his claim that Galleher told him he could not get the money to pay the note, and his denial that he knew of the agreement between Galleher and Dennis, both of which are clearly refuted, Jones' evidence shows no misrepresentation by Galleher of, and no failure on his part to disclose, any material fact as an inducement to the contract of January 8, 1941. Jones' own testimony shows that he did not rely on the statement he claimed Galleher made. When he testified to that statement, he said, "I had no doubt he had been able to pull money out of a rabbit's hat before." He knew that Galleher had to have more than five times that much money to put through the refinancing plan, and he also knew before he signed the January 8 contract that Galleher had paid the note to the receivers two days before.

For months after executing that contract he made no complaint to his attorney, who had approved the contract, that he had been deceived into parting with his rights in the stock, and in his letter to the directors of Duplex, more than a month later, presenting Galleher's refinancing offer, he stated:

"* * * Due to my inability to carry this stock myself I was forced to sell the same, but I now hold an option to repurchase this stock at any time prior to March 1st at the price of approximately One Hundred Thousand Dollars ($100,000), representing its original purchase price, plus the carrying charge on the same."

Under the contract of August 1, it was Jones' obligation to secure these 8,928 shares as an essential element in the refinancing plan. Galleher's only obligation in that respect

was to guarantee conditionally the note of Jones for the deferred payment. At the time of the contract of January 8, Galleher had paid Jones' obligation of $68,004.22 to the receivers for this stock; he then agreed to pay $25,951.22 to the out-of-town banks for Jones' obligations made to get the cash payment for this stock; and he had obligated himself to Dennis for $48,000 more because of this stock. He now agreed to resell the whole 8,928 shares at cost up to March 1, in order that Jones might have these shares available to carry through the plan to refinance Duplex, a project spoken of as an obsession with Jones, and of which he said, "My sole purpose, as clearly indicated, in acquiring that (stock) was not potential profit but simply the right to be able to refinance the company."

The testimony of Galleher is not incredible that Jones made no objection to his having the profits from half of this stock in view of the work he had done, the money he had put up and the risk he assumed in carrying through their joint project, which the evidence shows he had done against the urgent advice of his counsel.

In his petition Jones argues that the contract of January 8 was the result of a scheme on the part of Galleher to save something from the wreckage of his plan to refinance Duplex, which he concluded was ahead after receiving a letter of December 24 from his attorney, Mr. Powell, giving it as Mr. Powell's opinion that there was little hope of refinancing Duplex without long and uncertain litigation with the majority directors, and urging the hazards of the undertaking.

The record does not bear out Jones' contention. To the contrary, it shows that Galleher's actions were not motivated by that letter. It was repetition of advice he had had all along from Mr. Powell and with which he evidently disagreed; and admittedly, both before and after the contract of January 8, he made every effort to assist Jones to have his proposal accepted by Duplex.

It is argued, also, that Galleher failed to inform Jones of that letter and thereby violated his duty. Neither

Jones nor Galleher was asked whether this letter was discussed. Galleher testified frankly about receiving the letter and it was filed in evidence by his attorney. If it had been shown to Jones it would have been but an addition to many such opinions that he had heard. He grew up with this company and did not look to either Galleher or Powell to inform him as to the attitude of its directors or the prospect of their accepting Galleher's offer. Whether he saw the letter or not, he testified that on January 2 he and Galleher discussed backwards and forwards about what could be done, "and it was to the effect that the whole thing was blown up;" that "he couldn't pay the note and there wasn't any chance to get any refinancing before the directors."

Neither does the record bear out the claim that the evidence shows the contract of January 8 was procured by Galleher under circumstances of business compulsion and duress. It is argued that Galleher purposely created in Jones' mind the impression that unless he agreed to defendant's wishes, the $66,432 note would not be paid, the stock would be lost and the plan of refinancing would necessarily fail. These were not impressions created by Galleher. They were facts known by Jones from the beginning. When Jones signed the contract, the $66,432 note had already been paid with money made available by Dennis, who had been brought into the matter through the efforts of Galleher, and with the full approval of Jones. Jones knew as well as Galleher that without the stock the refinancing plan would fail. Both had expected the refinancing plan to go through in time to take care of the note. Jones testified "It was our hope that the thing would be accepted and be refinanced prior to the due date of that note." Galleher knew Jones could not pay and Jones knew Galleher was unwilling to tie up his money or credit in the stock. In that situation a new agreement was voluntarily made in full knowledge of the facts without any compulsion different from that which existed from the

beginning of the deal, the hope of both to carry through the refinancing plan to the profit of each.

The seventh assignment of error is to the refusal of the trial court to strike out certain testimony given by Mr. Dennis that Galleher told him, when asking him for financial assistance, that he could not afford to tie up that much money in that type of security (referring to the preferred stock bought from the receivers). The trial court held in its decree that that evidence had been rendered admissible by the examination of Dennis by Jones' counsel, but further that its exclusion would not alter the decision. We agree in both particulars.

We find no error in the decree appealed from and it is, therefore,

*Affirmed.*