TRAXLER, Chief Judge:
Petr Bocek brought this action against business consultant Joseph Amato and two companies associated with Amato after the defendants purchased a medical practice for themselves rather than for Bocek. The district court granted summary judgment in favor of the defendants, and Bocek appeals. We affirm in part, reverse in part, and remand for further proceedings.
I.
Plaintiff Petr Bocek is a medical doctor specializing in the treatment of allergies. Defendant Joseph Amato is the manager and sole member of defendant JGA Associates, LLC, a business consulting firm.
Bocek contacted Amato seeking assistance with the formation and financing of a new allergy care medical practice. On November 10, 2010, the parties entered into a contract (the “Consulting Agreement”) through which JGA agreed “to review and report on the feasibility of the proposed allergy medicine practice and prepare a business proposal for funding a start-up medical practice” and “render such other services as may be agreed upon by the Client and the Consultant.” J.A. 64. Under the terms of the Agreement, JGA would be compensated through “development fees” (hourly billing for consulting services) and a “completion fee” of two percent of the face amount of any business loan arranged by JGA.
A few days after signing the Consulting Agreement, Bocek asked Amato about the feasibility of buying an existing medical practice rather than starting a new practice. Bocek told Amato that Allergy Care Centers (“ACC”), where Bocek had previously worked, was being offered for sale by the administrator of the estate (the “Estate”) of ACC’s owner, who had died two years earlier. Amato responded positively, explaining that “[t]he acquisition of *171 an existing operating practice is always more attractive if the price and the historic financial performance make sense.” J.A. 68. After Bocek raised the possibility of buying ACC, there were no further discussions about Bocek starting a new practice; the relationship between Bocek and Amato focused exclusively on acquiring ACC’s assets.
Bocek told Amato that his acquisition of ACC might be complicated because he had been fired from ACC and was in the process of negotiating a severance package, and Bocek asked Amato to pursue the purchase of ACC without revealing Bocek’s identity as the buyer. To keep Bocek’s name out of the negotiations, Amato and Bocek ultimately settled on a “straw purchase” approach by which JGA (or an alternate holding company set up by Amato) would buy ACC and transfer it to Bocek after closing.
Emails show that by the end of December 2010, the parties were in general agreement on the overall structure and ultimate goal of the deal — ownership of the practice by Bocek — and what needed to be done to move forward with the transaction. There was, however, no agreement as to the structure or mechanics of the transfer from JGA to Bocek. For example, in a December 23 email, Amato told Bocek that while there were still open issues, Amato “intend[ed] to move forward” with the purchase of ACC “based on a few specific parameters,” including:
1. That our firm (or an alternate holding company) intends to initially purchase the practice with the direct intention of selling the practice (or the holding company) to you.
2. That you will commit to work with our firm during the due diligence process with the sole intention of becoming the eventual owner of ACC. The timing of the change in ownership would be automatic and agreed to by our firm and yourself before we execute the Purchase Agreement. The transfer of ownership to you will depend on your ability to fund the purchase of the practice from our firm and how quickly “we” are able to secure third-party financing for you to buy the practice from our firm; or if third-party financing is not immediately available, our firm would hold a seller-held note until such time that conventional funding can take out our note. The bottom line is that we would intend on transferring ownership to you as soon as all parties agree we can, that is after our firm’s purchase of the practice from the estate.
4. That you commit to buying the practice and/or running the practice (as owner or lead physician, your choice) under contract with the new company as a condition of us purchasing ACC. There may be a reason you do not want to own the practice immediately after our purchase of the firm; if so, we need to understand specifically what you want and we need to be sure that if we purchase the practice, day one you will be the company’s lead physician (either as the owner or key employee). You will need to understand that we will not go through with the purchase of ACC if you are not a direct part of our exit strategy.
J.A. 75. An email sent by Amato a few days later, after Bocek had passed along questions from his attorney about the purchase, reconfirmed the basic plan:
We are not purchasing the business on the behalf of an undisclosed purchaser; JGA “is” purchasing the business. Our intentions with the business after the deal is consummated will not be a concern for the Seller; we will be sure that nothing precludes us from selling the business once we have purchased *172 [it].... But please understand our only intention once we own the business would be to sell the business to you; and as I said before I do not think the estate could care less.
J.A. 81 (emphasis added).
On January 22, 2011, Amato sent Bocek an invoice for his services. The invoice reflected Bocek’s prior payment of $3,800 and sought an additional $4,574.40 “for expanded hours and third-party costs associated with the project development and acquisition negotiations for the purchase of the Allergy Care Center business operation on behalf of JGA Associates and Dr. Petr Bocek.” J.A. 1048.
On February 3, Amato sent the Estate a Letter of Intent (“LOI”) through which “JGA Associates, LLC, or its assigns” offered to purchase ACC’s assets for $1,000,000. J.A. 102. The LOI obligated the parties to negotiate in good faith, but the LOI was otherwise not binding; until the execution of a mutually agreeable asset purchase agreement, either side could walk away from the transaction without penalty. The Estate accepted the offer and returned an executed copy of the LOI to Amato late in the afternoon on February 8, 2011.
Earlier that same day (February 8), Amato had visited one of the ACC offices to meet with Margaret Crook, ACC’s practice manager. During the meeting, Crook told Amato that Bocek had been fired after he sexually harassed employees and used another doctor’s prescription pad to forge prescriptions for himself. This was the first Amato had heard of these issues; Bocek had told Amato that he had been fired, but he never provided any details about what happened, and Amato never asked. After meeting with Crook, Amato stalled and put off Bocek’s various inquiries until he could verify what he had learned.
On February 15, the Estate filed a petition in a Pennsylvania “Orphan’s Court” seeking approval for the sale of ACC. Bocek was then unaware that the sale was moving forward — Amato had not informed Bocek that he submitted the LOI to the Estate on February 3 or that the LOI had been accepted.
On February 17, 2011, after reviewing documents that confirmed Crook’s information, Amato sent a letter notifying Bocek of his intent to terminate their contractual relationship in 10 days, in accordance with the terms of the Consulting Agreement. Amato explained the termination in general terms, stating that during the due diligence process, “it became apparent ... that your involvement in any potential transaction would ... sour the deal. It also became evident that we could not move forward with your participation in any potential transaction without the possibility of serious repercussions thereafter.” J.A. 118.
Counsel for Bocek responded on February 22. Among other things, counsel noted that Amato, as Bocek’s agent, had a continuing duty of loyalty to Bocek and that Amato would be breaching his contractual and fiduciary duties “if [he] were to turn the acquisition of ACC into a deal which is of benefit to [him].” J.A. 1084. At the time of this letter, counsel was unaware of evidence showing that Amato did not take his duty of loyalty seriously. For example, while Bocek was under the impression that JGA would buy ACC and then sell it to Bocek at cost, Amato and potential investors were emailing each other about the possibility of buying ACC for $1 million and immediately flipping it to Bocek for $2 million. See J.A. 1021-22. In addition, Amato repeatedly told Bocek that when a letter of intent was submitted to the Estate, the purchase price offered would be $1.2 million, even though Amato had already submitted multiple draft LOIs *173 with a purchase price of $1 million to the Estate. See J.A. 1059-68.
On March 2, 2011, Amato incorporated a new company, A2 Medical Group, Inc., to serve as the purchaser of ACC’s assets. JGA at some point assigned its interests in the transaction to A2,[1] and the Estate and A2 executed an asset purchase agreement on May 13, 2011. Ten days later, the Orphan’s Court approved the sale of ACC to “JGA Associates, LLC and its assigns in accordance with the purchase amount and terms set forth in the May 13, 2011 Asset Purchase Agreement.” J.A. 1129. The sale closed on June 22, 2011. At no time between the February 17 termination of the Consulting Agreement and the closing of the sale did Bocek make an offer to purchase ACC.
After unsuccessfully seeking an injunction to prohibit Amato and JGA from buying ACC, Bocek filed an amended complaint asserting four causes of action against Amato, JGA, and A2: (1) fraudulent conveyance and constructive trust; (2) breach of fiduciary duties; (3) breach of contract; and (4) breach of fiduciary duties as joint venturers. The district court granted summary judgment in favor of the defendants and dismissed the case. Bocek appeals, arguing that he presented evidence sufficient to preclude summary judgment as to each cause of action.
II.
Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). “We review a district court’s decision to grant summary judgment de novo, applying the same legal standards as the district court and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.” T-Mobile Northeast LLC v. City Council of Newport News, 674 F.3d 380, 384-85 (4th Cir.2012) (internal quotation marks omitted).
A.
We begin with Count III, the breach of contract claim. The amended complaint set out the relevant terms of the Consulting Agreement, including the portion through which JGA agreed to “render such other services as may be agreed upon by the Client and the Consultant.” J.A. 26, 55. Bocek also alleged that he and JGA “agreed that JGA would purchase ACC’s assets as a ‘straw purchaser’ and immediately transfer ownership thereof to Bocek.” J.A. 55. Bocek alleged that JGA breached the Consulting Agreement by, inter alia, using information learned from Bocek for JGA’s own benefit, and that JGA breached the contract by entering into the LOI and transferring its rights to A2, “thus ensuring that Bocek could not ... acquire ACC’s assets.” J.A. 55.
The district court granted summary judgment in favor of the defendants. In *174 the district court’s view, Bocek was not claiming that JGA breached the Consulting Agreement, see JA. 1207 n. 1, but was only alleging that JGA breached a separate, oral agreement for the straw purchase and immediate re-transfer of ACC (the “Straw Purchase Agreement”). And with that understanding of the claim, the court then rejected it, explaining that “there is no evidence that the oral contract allegedly breached ever validly existed due to the absence of a meeting of the minds on the issue of Dr. Bocek’s entitlement to rights in [ACC] subsequent to the execution of the Consulting Agreement.” J.A. 1207. The defendants approach the issue similarly, contending on appeal that Bocek’s breach of contract claim is premised not on the Consulting Agreement, but on “the untenable and unsupported notion that he had an oral agreement with JGA to purchase a $1 million medical practice even though there is no evidence that he and JGA ever agreed on any of the material terms necessary to purchase [ACC].” Brief of Appellee at 43.
While the Amended Complaint . included allegations about the Straw Purchase Agreement, it also very clearly alleged breaches of the Consulting Agreement.[2] On appeal, however, Bocek focuses on the Straw Purchase Agreement, not the Consulting Agreement. Bocek does not identify the district court’s misreading of his breach of contract claim as an issue on appeal, see Brief of Appellant at 2, nor does he argue in the substantive portions of his brief that the defendants’ actions amounted to breaches of the Consulting Agreement. To the contrary, Bocek states throughout his brief that the services performed by JGA in connection with the ACC acquisition were not performed under the Consulting Agreement but were instead performed under the Straw Purchase Agreement.[3] Because Bocek’s position on appeal is that the defendants’ ACC-related actions breached the Straw Purchase Agreement, not the Consulting Agreement, we are constrained to conclude that Bocek has waived any breach of contract claim premised on a breach of the Consulting Agreement. See, e.g., West Va. CWP Fund v. Stacy, 671 F.3d 378, 389 (4th Cir.2011) (arguments not raised in opening brief are waived).
The question, then, is whether a breach of contract claim based on the putative Straw Purchase Agreement is viable. See Progressive Constr. Co. v. *175 Thumm, 209 Va. 24, 161 S.E.2d 687, 691 (1968) (To be binding and enforceable, a contract “must identify the subject matter and spell out the essential commitments and agreements with respect thereto.”). Bocek argues that the evidence in the record shows a meeting of the minds on all material terms of the Straw Purchase Agreement — the identity of the parties, the nature of the work to be performed, the duration of the agreement, and the compensation to be paid. See Reid v. Boyle, 259 Va. 356, 527 S.E.2d 137, 145 (2000) (listing essential terms of a contract for services). According to Bocek, the district court improperly focused on the asset purchase agreement that the parties intended to enter into after JGA’s straw purchase of ACC rather than the Straw Purchase Agreement. In Bocek’s view, the mechanics of the transfer from JGA to Bocek is not a material term of the ACC acquisition deal, and the absence of agreement over those details does not preclude enforcement of the contract. We disagree.
The record shows that the parties were considering a number of ways to structure the transfer, including: (1) Bocek being made a minority partner in the entity actually purchasing ACC; (2) Bocek running the practice under contract with the purchasing entity; (3) Bocek obtaining a loan to cover the full purchase price, which would permit the transfer to Bocek immediately after the ACC purchase was completed; and (4) JGA or Amato holding the note for the purchase price and Bocek repaying with the proceeds of the allergy practice, with the expectation that Bocek could re-finance with an institutional lender and pay off the loan within 18-24 months. The ultimate transfer of ACC from JGA to Bocek was the whole point of the ACC transaction, and the various ways contemplated by the parties to accomplish that transfer have widely varying costs and consequences. Under these circumstances, it is difficult to describe the structure and terms of that transfer as anything but essential to the purported contract. And because the transfer from JGA to Bocek is an essential term, an agreement to agree in the future is not sufficient. See Allen v. Aetna Cas. & Sur. Co., 222 Va. 361, 281 S.E.2d 818, 819 (1981) (per curiam) (“[A]n agreement to make a settlement, without specifying more, constitutes only an agreement to negotiate at a later date.”); 1 Williston on Contracts § 4:29 (4th ed.) (“[I]f an essential element is reserved for the future agreement of both parties, as a general rule, the promise can give rise to no legal obligation until such future agreement.”).
The parties “must assent to the same thing in the same sense, and their minds must meet as to all the terms,” and those terms “must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable.” Smith v. Farrell, 199 Va. 121, 98 S.E.2d 3, 7 (1957); see Restatement (Second) of Contracts § 33(2) (contract terms must be certain enough to provide “a basis for determining the existence of a breach and for giving an appropriate remedy”). In this case, the parties never agreed on the structure of the transfer from JGA to Bocek, an essential part of the deal, and the Straw Purchase Agreement is therefore not enforceable. See R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 480 S.E.2d 477, 480 (1997) (“A contract will be enforced if its obligations are reasonably certain.”). And because the Straw Purchase Agreement is now the sole basis for Bocek’s breach of contract claim, the district court properly granted summary judgment in favor of the defendants on that count.
B.
We turn next to the breach of fiduciary duty claim. In his Amended Com *176 plaint, Bocek alleged that Amato and JGA, as his agents, owed him various fiduciary duties, including a duty of loyalty. Bocek alleged that he brought the ACC business opportunity to JGA during the existence of the agency relation, and that JGA was acting on behalf of Bocek when it began negotiating with the Estate and conducting due diligence. Bocek alleged that the defendants breached their fiduciary duties by, inter alia, using information obtained on Bocek’s behalf to pursue the acquisition of ACC for themselves, refusing to return the due diligence materials to him, and, of course, buying ACC for their own benefit rather than for Bocek’s benefit.
The evidence in the record is more than sufficient, for summary-judgment purposes, to support the factual allegations outlined above, and there is little question that, under the general law of agency, the conduct Bocek alleges is a clear breach of fiduciary duty. Agents are fiduciaries and owe their principals a strict duty of loyalty. See Restatement (Third) of Agency § 8.01 (“An agent has a fiduciary duty to act loyally for the principal’s benefit in all matters connected with the agency relationship.”). An agent breaches his fiduciary duties by purchasing for himself property that he was to purchase for his principal. See Rowland v. Kable, 174 Va. 343, 6 S.E.2d 633, 642 (1940) (“One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself.... The rule applies alike to agents, partners, guardians, executors and administrators .... ”); Horne v. Holley, 167 Va. 234, 188 S.E. 169, 172 (1936) (“It is well settled that where one person sustains a fiduciary relation to another he cannot acquire an interest in the subject matter of the relationship adverse to such other party.”). An agent likewise breaches his fiduciary duty by using confidential information belonging to the principal for the agent’s own benefit. See Restatement (Third) of Agency § 8.05(2) (“An agent has a duty ... not to use or communicate confidential information of the principal for the agent’s own purposes or those of a third party.”).
The district court nonetheless granted summary judgment for the defendants, concluding that Bocek could seek recovery for those breaches of fiduciary duty only through a breach of contract cause of action. Noting that a claim for breach of fiduciary duty can sound in contract or tort, see Augusta Mut. Ins. Co. v. Mason, 274 Va. 199, 645 S.E.2d 290, 293 (2007), the district court held that the fiduciary duties at issue in this case arose from the Consulting Agreement, not independently of it. The court therefore concluded that “the recovery in tort Dr. Bocek seeks is proscribed as a matter of law,” J.A. 1204, and that the defendants were entitled to summary judgment on Count II. See Augusta Mutual, 645 S.E.2d at 293 (where single act can support a claim for breach of contract and a claim breach of a duty arising in tort, “in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract” (internal quotation marks omitted)); see also Station #2, LLC v. Lynch, 280 Va. 166, 695 S.E.2d 537, 540 (2010) (“[A]n omission or non-performance of a duty may sound both in contract and in tort, but only where the omission or non-performance of the contractual duty also violates a common law duty.”).
Many of Bocek’s challenges to this ruling are unpersuasive, as they appear to rest on a misapprehension of the principles underlying the legal rule applied in Augusta Mutual. Nevertheless, we find ourselves in agreement with Bocek that the timing of the breach of duty in this case makes the rule inapplicable.
*177 As the decision in Augusta Mutual demonstrates, Virginia courts vigilantly police the border between tort and contract law so as “[t]o avoid turning every breach of contract into a tort.” Augusta Mutual, 645 S.E.2d at 298. Nonetheless, recovery in tort is permitted in cases where the tort was committed after the termination of the parties’ contract. See Condominium Servs., Inc. v. First Owners’Ass’n, 281 Va. 561, 709 S.E.2d 163, 171 (2011) (rejecting defendant’s assertion that plaintiff could not proceed on tort claim and breach of contract claim: “Because the Management Agreement had terminated [when the tort was committed], CSI’s alleged acts did constitute the independent, willful tort of conversion, separate from the contract.” (internal quotation marks omitted)); cf. Today Homes, Inc. v. Williams, 272 Va. 462, 634 S.E.2d 737, 744 (2006) (agent’s liability for breach of fiduciary duty continues after termination of the agency relationship only for “transactions completed after termination of the officer’s association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship” (internal quotation marks omitted)).
The agency relation terminated on February 27, 2011, ten days after Amato gave Bocek the notice required under the Consulting Agreement, well before the breaches of fiduciary duty alleged in this case. Because the contractual relationship ended before the torts were committed, Bocek’s breach of fiduciary duty claims are therefore independent of the Consulting Agreement, and Bocek is entitled to proceed on and recover for those claims in tort.[4] See Condominium Servs., 709 S.E.2d at 171. Accordingly, the district court erred by granting summary judgment against the breach of fiduciary duty claim asserted in Count II of the amended complaint.
C.
We turn now to Bocek’s fraudulent conveyance claim. Under Virginia law,
[e]very gift, conveyance, assignment or transfer of ... any estate, real or personal, ... with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void.
Va.Code Ann. § 55-80. The district court granted summary judgment against the claim because Bocek could not show a conveyance of ACC assets by JGA:
Plaintiff cannot establish the existence of a conveyance by JGA because JGA never owned [ACC’s] assets to convey them. [ACC] did not bind itself when it executed the Letter of Intent with JGA, nor did JGA bind itself to acquire the assets. The Letter of Intent served to permit JGA or its assigns to purchase [ACC’s] assets. In the end, A2 purchased the assets of [ACC] directly from the Estate. JGA never acquired [ACC’s] assets, and therefore JGA never had any legal right or entitlement to those assets. Having no legal interest in [ACC], JGA could not legally have conveyed or assigned any rights to the assets of [ACC].
J.A. 1200.
As Bocek points out, however, his fraudulent conveyance claim is not based on *178 JGA’s conveyance of ACC’s assets to A2, but on JGA’s conveyance of its right to purchase ACC’s assets. See J.A. 49, ¶¶ 253-54. While the district court’s focus on ownership rather than the right to purchase was arguably erroneous in light of the allegations in the Amended Complaint, we find no error in the court’s ultimate disposition of Bocek’s fraudulent conveyance claim.
The purpose of the fraudulent conveyance statute is to protect creditors from a debtor’s efforts to shield his property from being used to satisfy his debts. See Buchanan v. Buchanan, 266 Va. 207, 585 S.E.2d 533, 535 (2003) (“The essence of fraudulent conveyance ... is the diminution of the debtor’s estate to the detriment of the creditor’s right of realization.” (internal quotation marks omitted)). As Bocek recognizes, see Brief of Appellant at 26 n. 7, a conveyance diminishes the debtor’s estate and works to the detriment of creditors, however, only if the property conveyed has value. See, e.g., 37 Am. Jur. 2d, Fraudulent Conveyances & Transfers § 72 (“If nothing of value is transferred when property is transferred ..., then there is nothing to avoid and recover and no fraudulent conveyance.”); 37 C.J.S. Fraudulent Conveyances § 9 (“A transfer of property of little or no value will generally not be treated as fraudulent as against creditors.... ”); see also Balzer & Assocs., Inc. v. The Lakes on 360, Inc., 250 Va. 527, 463 S.E.2d 453, 456 (1995) (allowing fraudulent conveyance claim to proceed where creditor’s evidence “support[ed] the reasonable inference of the property having value at or above the established level of the encumbrances upon it”). In this case, however, there simply is no evidence in the record showing that the property conveyed had value.
The JGA-to-A2 assignment is the only relevant conveyance, and the property conveyed by that assignment was, in Bocek’s words, JGA’s “right to acquire ACC.” Brief of Appellant at 26. At the time of the assignment,[5] however, the only rights JGA had were those arising under the LOI accepted by the Estate. And as previously noted, the LOI was not binding — neither JGA nor the Estate had any obligation under the LOI to proceed with the sale unless and until they agreed on the terms of the asset purchase agreement. The LOI, therefore, was nothing more than an unenforceable agreement to negotiate, see Allen, 281 S.E.2d at 819, not an option contract, as Bocek insists. See, e.g., Hart v. Hart, 35 Va.App. 221, 544 S.E.2d 366, 373 (2001) (“An option is merely a continuing offer to sell, irrevocable during the option period.” (internal quotation marks omitted)).[6]
Because the LOI was not binding and enforceable, it gave JGA no enforceable rights to purchase ACC. And because Bocek can point to no evidence showing that these unenforceable rights had value, the district court properly rejected the fraudulent conveyance claim.
D.
Finally, we turn to the joint venture claim. “A joint venture is established by contract, express or implied, where two *179 or more persons jointly undertake a specific business enterprise for profit, -with each to share in the profits or losses and each to have a voice in the control and management.” Ortiz v. Barrett, 222 Va. 118, 278 S.E.2d 883, 840 (1981). “Coadventurers stand in a fiduciary relation to each other, and within the scope of the enterprise they are bound by the same standards of good conduct and square dealing as are required between partners.” Jones v. Galleher & Co., 187 Va. 602, 47 S.E.2d 333, 337 (1948).
Bocek argues (in the alternative to Counts II and III) that if no principal-agent relationship existed between him and Amato (through JGA), then the relationship was one of joint venturers, and that the defendants’ acquisition of ACC for their own benefit violated the fiduciary duties they owed Bocek. We disagree. As we have previously discussed, the parties never reached agreement on how the transfer of ACC’s assets from JGA to Bocek would be structured, and there simply is no evidence showing that Bocek and Amato ever reached an agreement to operate the ACC offices together, with each sharing in the profits and having a say in management and control of the business. See Ortiz, 278 S.E.2d at 840. The district court therefore properly granted summary judgment in favor of the defendants on the joint venture claim.
III.
Accordingly, for the foregoing reasons, we hereby affirm the district court’s grant of summary judgment in favor of the defendants on Bocek’s breach of contract, fraudulent conveyance, and joint venture claims. We reverse the grant of summary judgment on the claim for breach of fiduciary duty and remand for further proceedings on that claim.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. No written assignment appears in the record, but emails from Amato and his partner in A2 make it clear enough for summary-judgment purposes that an assignment was effectuated in a way that was acceptable to the parties. See J.A. 899 (March 8 email from Amato informing Estate that his corporate attorney and his partner will "have the assignment document prepared that will tie the transaction together"); id. (March 8 email to Estate from Amato’s partner stating that the attorney will “get me the assignment document to transfer the purchase from JGA to A2 Medical Group, Inc. since that will be the formal acquisition company”); see also Amato deposition, J.A. 1102 (“JGA eventually, as the Estate knew, was going to assign the purchase to someone. A2 medical was eventually established as the entity that would receive that assignment with the permission of the Estate.”).

. See J.A. 26, ¶ 45 (referring to November 2010 Consulting Agreement as "the Agreement”); J.A. 55, ¶ 305 ("JGA agreed, per the terms of the Agreement, to 'render such other services as may be agreed upon by the Client and the Consultant from time to time.’ ”); id., ¶ 309 ("JGA breached the Agreement by utilizing information learned from Bocek ... to fully analyze the desirability of purchasing ACC's assets for JGA’s benefit and not for the benefit of JGA’s client, Bocek.”); id., ¶310 ("JGA breached the Agreement by.... ”); id., ¶ 311 ("JGA further breached the Agreement by....”).

. See, e.g., Brief of Appellant at 38-39 ("The acquisition of ACC was not envisioned by the Parties in the making of the [Consulting] Agreement and so the terms of that Agreement do not extend to the acquisition of an existing practice.”); id. at 42 n. 15 ("[T]he [Consulting] Agreement cannot be read to govern the acquisition of ACC because there is no evidence in the record of any agreement between the parties to expand the scope of work. Furthermore, the work necessary for the ACC acquisition was the subject of a separate agreement in which the Parties addressed, inter alia, JGA’s compensation for those services and its role as straw purchaser.”); id. at 45 n. 17 ("The agreement for JGA's assistance to acquire ACC was clearly not envisioned ... or done pursuant to the [Consulting] Agreement.”).

. Our determination that Bocek waived his right to proceed on any breach of contract based on the Consulting Agreement has no bearing on the breach of fiduciary duty claim. Bocek’s failure to argue on appeal that the defendants breached the Consulting Agreement amounted to a waiver of that claim, but it cannot be viewed as a waiver of facts alleged in the complaint and separate theories argued below and pursued on appeal.

. The precise date of the assignment cannot be determined from the record. Nonetheless, because the asset purchase agreement required by the LOI was executed by A2 rather than JGA, the assignment must have taken place sometime before the purchase agreement was signed on May 13, 2011.

. To the extent that Bocek argues that the Pennsylvania court's approval of the sale gave value to JGA's right to buy ACC, the court approval came after JGA assigned its interests to A2. There simply is no evidence showing that JGA's "right” had value when assigned.