**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1208

PETR BOCEK, M.D., PHD,

Plaintiff - Appellant,

v.

JGA ASSOCIATES, LLC; JOSEPH P. AMATO,

Defendants – Appellees,

and

ALLERGY CARE CENTERS, VIRGINIA, INC.; A2 MEDICAL GROUP, INC.,

Defendant,

LENA BOCEK,

Movant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:11-cv-00546-CMH-JFA)

Argued: March 24, 2015

Decided: June 18, 2015

Before TRAXLER, Chief Judge, and WILKINSON and NIEMEYER, Circuit Judges.

Reversed and remanded by unpublished opinion. Chief Judge Traxler wrote the opinion in which Judge Niemeyer joined. Judge Wilkinson wrote a separate concurring opinion.

**ARGUED**: S. Micah Salb, LIPPMAN, SEMSKER & SALB, LLC, Bethesda, Maryland, for Appellant.  Kristen Michelle Kanaskie, SHER, CUMMINGS AND ELLIS, PLLC, Arlington, Virginia, for Appellees. **ON BRIEF**: Mary E. Kuntz, Ph.D., LIPPMAN, SEMSKER & SALB, LLC, Bethesda, Maryland, for Appellant.  David E. Sher, Mark D. Cummings, SHER, CUMMINGS AND ELLIS, PLLC, Arlington, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Chief Judge:

Petr Bocek brought this action against business consultant Joseph Amato and two companies associated with Amato after the defendants purchased a medical practice for themselves rather than for Bocek. Following a bench trial, the district court granted judgment in favor of the defendants, and Bocek appeals. We reverse and remand for a new trial.

I.

Plaintiff Petr Bocek is a medical doctor specializing in the treatment of allergies. Defendant Joseph Amato is the manager and sole member of defendant JGA Associates, LLC, a business consulting firm.

Bocek contacted Amato seeking assistance with the formation and financing of a new allergy care medical practice. On November 10, 2010, the parties entered into a contract (the "Consulting Agreement") through which JGA agreed "to review and report on the feasibility of the proposed allergy medicine practice and prepare a business proposal for funding a start-up medical practice" and "render such other services as may be agreed upon by [Bocek] and [JGA]." J.A. 221. The agreement provided that JGA would have "the right to act [as] an agent representing [Bocek] to Interested Parties during the term of this Agreement." J.A. 221. (Amato clarified that "Interested Parties" in that context referred to prospective lenders.) The

3

agreement also provided that JGA would be compensated through "development fees" (hourly billing for consulting services) and a "completion fee" of two percent of the face amount of any business loan that JGA arranged.

On November 15, five days after signing the Consulting Agreement, Bocek asked Amato about the feasibility of buying an existing medical practice rather than starting a new practice. Bocek told Amato that Allergy Care Centers ("ACC"), where Bocek had previously worked, was being offered for sale by the administrator of the estate of ACC's owner, who had died two years earlier. Bocek noted that the Estate was burdened with taxes and that the practice was profitable, and he suggested that reductions in offices and staff could make it even more so. Amato responded positively, explaining that "[t]he acquisition of an existing operating practice is always more attractive if the price and the historic financial performance make sense." J.A. 225.

Bocek informed Amato in an email on December 1 that ACC was currently owned by the estate of Charles M. Valentine (the "Estate") and that Peter Klenk was the lawyer handling the Estate. The email stated that Bocek was unsure how to confirm that ACC was for sale and, if it was, what price the estate was asking, but that Bocek would want an independent appraisal regardless. Bocek also told Amato that his acquisition of ACC

4

might be complicated because he had been fired from ACC and was in the process of negotiating a severance package, and Bocek asked Amato to pursue the purchase of ACC without revealing Bocek's identity as the buyer.

By that afternoon, Amato had communicated with Klenk and informed Bocek that ACC was in fact on the market. Amato told Bocek that he would assemble a checklist of information that he would need to review and he would include any special requests from Bocek when he communicated again with Klenk. Amato also told Bocek that the purchase would "be considered an asset-only transaction." J.A. 237. On December 15, JGA sent Bocek an email containing a historical financial analysis, a preliminary business valuation report, as well as an excel document he had created regarding ACC's accounting summaries. Bocek spoke to Amato the next day regarding these documents.

The evidence regarding the conversations between Bocek and Amato is somewhat in dispute. Nevertheless, it appears that Bocek was concerned that he might not have the cash available to make a sufficient down payment. Amato testified that for that reason, and because Bocek wanted to keep his name out of the transaction with the Estate, he was exploring a number of different ways to structure the deal, including a mezzanine lending structure. Under that structure, a lender would have some rights to convert its loan to an ownership or equity

5

interest in the practice if the loan were not timely repaid in full.

On December 23, Amato sent Bocek an email informing him that JGA had "put in a closed bid to purchase ACC on Monday . . . to attempt to secure a position in the possible acquisition of ACC," that the law firm Klenk had hired was considering the offer, and that they "could begin a formal due diligence process with ACC." J.A. 265. Amato added that "there are still many questions both our firm and you may have regarding the transaction." J.A. 265. For that reason, Amato stated that he "intend[ed] to move forward based on a few specific parameters." J.A. 265. As is relevant here, Amato stated that "[JGA] (or an alternate holding company) intends to initially purchase the practice with the direct intention of selling the practice (or the holding company) to" Bocek. J.A. 265.

In response, on December 27 Bocek sent Amato an email confirming that he understood that he would "be the owner of ACC from the day of purchase." J.A. 267. However, he expressed uncertainty regarding how the purchase would be structured and who would provide the down payment. The next day Amato emailed Bocek, once again confirming that JGA's goal was to make Bocek the owner of ACC from the day of purchase. In the end, however, although Amato and Bocek discussed several options regarding how the deal would be structured, they never resolved that issue.

6

On January 22, 2011, Amato sent Bocek an invoice for his services. The invoice reflected Bocek's prior payment of $3,800.00 and sought an additional $4,574.40 "for expanded hours and third-party costs associated with the project development and acquisition negotiations for the purchase of the Allergy Care Center business operation on behalf of JGA Associates and Dr. Petr Bocek." J.A. 291. On January 31, Bocek sent an email to JGA indicating that his lawyers would be in contact with JGA to put in place a new written contract since the Consulting Agreement was created under the assumption that Bocek would be developing and obtaining financing for a new practice rather than acquiring an existing one.

On February 3, Amato sent the Estate a Letter of Intent ("LOI") through which "JGA Associates, LLC, or its assigns" offered to purchase ACC's assets for $1,000,000. J.A. 301. The LOI obligated the parties to negotiate in good faith, but it was otherwise not binding; until the execution of a mutually agreeable asset purchase agreement, either side could walk away from the transaction without penalty. The Estate accepted the offer and returned an executed copy of the LOI to Amato late in the afternoon on February 8.

Earlier that same day (February 8), Amato had visited one of the ACC offices to meet with Terri Crook, ACC's practice manager. During the meeting, Crook told Amato that Bocek had

7

been fired after he sexually harassed employees and used another doctor's prescription pad to forge prescriptions for himself. This was the first Amato had heard of these issues; although Bocek had told Amato that he had been fired, he had never provided any details about what happened, and Amato had never asked. After meeting with Crook, Amato stalled and put off Bocek's various inquiries until he could verify what he had learned.

On February 15, the Estate filed a petition in a Pennsylvania "Orphan's Court" seeking approval for the sale of ACC. Bocek was then unaware that the sale was moving forward – Amato had not informed Bocek that he submitted the LOI to the Estate on February 3 or that the LOI had been accepted.

On February 17, after reviewing documents that confirmed Crook's information, Amato sent a letter notifying Bocek of his intent to terminate their contractual relationship in 10 days, in accordance with the terms of the Consulting Agreement. Amato explained the termination in general terms, stating that during the due-diligence process, "it became apparent . . . that your involvement in any potential transaction would . . . sour the deal. It also became evident that we could not move forward with your participation in any potential transaction without the possibility of serious repercussions thereafter." J.A. 317.

8

Counsel for Bocek responded on February 22. Among other things, counsel noted that Amato, as Bocek's agent, had a continuing duty of loyalty to Bocek and that Amato would be breaching his contractual and fiduciary duties "if [he] were to turn the acquisition of ACC into a deal which is of benefit to [him]." J.A. 629. Nevertheless, on March 2, Amato incorporated a new company, A2 Medical Group, Inc. ("A2"), to serve as the purchaser of ACC's assets. Brian August, Jeffrey Renzulli, and Amato were named as directors of A2, with Amato and Brian August each owning 49 percent of A2's shares and Carolyn August owning two percent. JGA at some point assigned its interests in the transaction to A2, and the Estate and A2 executed an asset purchase agreement on May 13. Ten days later, the Orphan's Court approved the sale, and the sale closed on June 22.

Bocek testified that after Amato terminated the agreement, Bocek simply wanted Amato to give Bocek the due diligence documents and analysis that Amato had developed for him, and that Bocek was prepared to purchase ACC himself. Bocek never made an offer, however.

After unsuccessfully seeking an injunction to prohibit Amato and JGA from buying ACC, Bocek filed an Amended Complaint asserting four causes of action against Amato, JGA, and A2: (1) fraudulent conveyance and constructive trust; (2) breach of fiduciary duties; (3) breach of contract; and (4) breach of

9

fiduciary duties as joint venturers.  The district court granted summary judgment in favor of the defendants and dismissed the case.

It is the breach-of-fiduciary-duties claim that is at issue in this appeal.  In his Amended Complaint, Bocek alleged that Amato and JGA, as his agents, owed him various fiduciary duties, including a duty of loyalty.  Bocek alleged that he brought the ACC business opportunity to JGA during the existence of the agency relation, and that JGA was acting on behalf of Bocek when it began negotiating with the Estate and conducting due diligence.  Bocek alleged that the defendants breached their fiduciary duties by, inter alia, using information obtained on Bocek's behalf to pursue the acquisition of ACC for themselves, refusing to return the due diligence materials to him, and, of course, buying ACC for their own benefit rather than for Bocek's benefit.

Regarding this claim, the district court held that because the fiduciary duties at issue arose from the Consulting Agreement, not independently of it, Bocek was precluded as a matter of law from recovering in tort for the breach.  See Augusta Mut. Ins. Co. v. Mason, 645 S.E.2d 290, 293 (Va. 2007) (where single act can support a claim for breach of contract and a claim for breach of a duty arising in tort, "in order to recover in tort, the duty tortiously or negligently

10

breached must be a common law duty, not one existing between the parties solely by virtue of the contract" (internal quotation marks omitted)); see also Station #2, LLC v. Lynch, 695 S.E.2d 537, 540 (Va. 2010) ("[A]n omission or non-performance of a duty may sound both in contract and in tort, but only where the omission or non-performance of the contractual duty also violates a common law duty.").

On appeal, we affirmed regarding the breach-of-contract, fraudulent-conveyance, and joint-venture claims. See Bocek v. JGA Assocs., LLC, 537 F. App'x 169, 179 (4th Cir. 2013). However, we reversed concerning the claim for breach of fiduciary duties, with Chief Judge Traxler and Judge Niemeyer articulating slightly differing rationales for their decisions, and with Judge Wilkinson dissenting. See id. at 176-77 (Traxler, C.J.); id. at 179-80 (Niemeyer, J., concurring in part and concurring in the judgment); id. at 180-82 (Wilkinson, J., concurring and dissenting).

Chief Judge Traxler observed that

> Bocek alleged that he brought the ACC business opportunity to JGA during the existence of the agency relation, and that JGA was acting on behalf of Bocek when it began negotiating with the Estate and conducting due diligence. Bocek alleged that the defendants breached their fiduciary duties by, inter alia, using information obtained on Bocek's behalf to pursue the acquisition of ACC for themselves, refusing to return the due diligence materials to him, and, of course, buying ACC for their own benefit rather than for Bocek's benefit.

11

Id. at 176 (Traxler, C.J.). Chief Judge Traxler reasoned that if these factual allegations were proven at trial, the defendants' conduct would constitute a clear breach of fiduciary duty. See id. (Traxler, C.J.). Chief Judge Traxler concluded that Augusta Mutual, on which the district court had relied, did not bar recovery on a breach-of-fiduciary-duty theory. He further concluded that even if the fiduciary duty arose from contract, "recovery in tort is permitted in cases [such as this one] where the tort was committed after the termination of the parties' contract." Id. at 177 (Traxler, C.J.).

In a separate opinion, Judge Niemeyer explained that the actions Bocek alleged, if proven at trial, would "give rise to a classic claim for breach of the duty of loyalty inherent in the agency agreement that existed between Bocek and JGA." Id. at 179 (Niemeyer, J., concurring in part and concurring in the judgment). Judge Niemeyer also concluded that "[t]he fact that JGA terminated the agency agreement before taking advantage of the opportunity that came to it while it was an agent provides no defense." Id. at 179-80 (Niemeyer, J., concurring in part and concurring in the judgment).[1]

---

[1] In dissent, Judge Wilkinson reasoned that the defendants' duty to refrain from using Bocek's information arose contractually, and thus that the defendants' use of the information they acquired from Bocek and on his behalf did not give rise to a viable tort claim. See Bocek v. JGA Assocs., (Continued)

12

On remand, following a bench trial, the district court granted judgment to the defendants. For reasons that we will discuss, the district court ruled that Bocek did not prove that the defendants had an agency relationship with him such that fiduciary obligations would arise and that, even if they had breached fiduciary duties owed to Bocek, Bocek failed to prove damages from any breach.

## II.

On appeal, Bocek challenges both the ruling that Amato was not acting as Bocek's agent with regard to the possible purchase of ACC and the ruling that Bocek failed to prove any damages even if he did prove that the defendants breached fiduciary duties they owed to him. We consider these rulings seriatim.

## A.

We begin by addressing the district court's analysis of the agency issue. The district court stated that "[i]n seeking to demonstrate an agency relationship, Bocek seemingly attempts to implicate two different 'agreements': (1) the written Consulting Agreement; and (2) an oral straw-purchase agreement for the purchase of Allergy Care Centers." J.A. 654. The court determined that the written agreement did not demonstrate that

LLC, 537 F. App'x 169, 180-82 (4th Cir. 2013) (Wilkinson, J., concurring and dissenting).

13

the defendants agreed to act as Bocek's agent to purchase the ACC because that agreement provided for JGA's services in conjunction with a new, not an existing, medical practice. And, regarding a possible _oral_ agency agreement, the district court noted that there was no meeting of the minds between the parties such as would be necessary to create a binding contract for the defendants to make a straw purchase of ACC. The district court observed that while the parties had discussed a number of options of how such a purchase might be accomplished, they had not agreed upon any particular method, and thus they had formed only a nonbinding agreement to agree regarding a straw purchase. For both of these reasons, the district court concluded that "Bocek did not carry his burden to establish an agency relationship between himself and JGA or Amato, and therefore he fail[ed] to establish that JGA or Amato owed him a fiduciary obligation." J.A. 660.

On appeal, Bocek does not specifically challenge either premise of the district court's conclusion that he failed to establish the agency relationship. Rather, Bocek's position is that the district court erred in concluding that, in attempting to demonstrate the agency relationship, he relied only on the existence of the written agreement and on a binding oral contract for Amato to purchase ACC on Bocek's behalf. Bocek maintains that the parties' conduct <u>after they entered into the</u>

14

written agreement clearly demonstrated the existence of the agency relationship.[2] And Bocek claims that he was not required to show the formation of an oral agency contract in order to show that Amato actually became Bocek's agent regarding the possible purchase. Rather, Bocek maintains he needed only to show that the parties each consented to Amato's acting on Bocek's behalf and under his control with regard to the efforts to purchase ACC. Bocek contends that he clearly made that showing based on the undisputed facts proven at trial. We agree with Bocek on all of these points.

On consideration of an appeal following a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 427 (4th Cir. 2010) (per curiam). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

---

[2] Indeed, the proposed conclusions of law Bocek submitted to the district court following the trial included the legal conclusion that "The Defendants were Bocek's agents for purposes of acquiring ACC. Extensive email exchanges between Dr. Bocek and Mr. Amato establish that Amato undertook steps toward the purchase of ACC on behalf of, and at the direction of, Bocek. JGA's billing for these services to Dr. Bocek confirm the relationship." Plaintiff's Proposed Findings of Fact and Conclusions of Law 13-14, Docket No. 206, Civil Action No. 1:11-cv-00546 (E.D. Va. Dec. 16, 2013).

15

conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

In Virginia, "[a]gency is a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to act." Reistroffer v. Person, 439 S.E.2d 376, 378 (Va. 1994). Such a fiduciary relationship is found when "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." H-B Ltd. P'ship v. Wimmer, 257 S.E.2d 770, 773 (Va. 1979). Regarding the right to control, "direct evidence is not indispensable – indeed frequently is not available – but instead circumstances may be relied on, such as the relation of the parties to each other and their conduct with reference to the subject matter of the contract." Acordia of Va. Ins. Agency v. Genito Glenn, L.P., 560 S.E.2d 246, 250 (Va. 2002) (alteration and internal quotation marks omitted); see Royal Indem. Co. v. Hook, 157 S.E. 414, 419 (Va. 1931) ("Frequently [agency] is established and has, of necessity, to be established by circumstantial evidence."). "Agency may be inferred from the conduct of the parties and from the surrounding facts and circumstances." Drake v. Livesay, 341 S.E.2d 186, 189 (Va. 1986). "Whether an agency relationship

16

exists is a question to be resolved by the fact finder unless the existence of the relationship is shown by undisputed facts or by unambiguous written documents." Acordia of Va. Ins. Agency, 560 S.E.2d at 250 (alteration and internal quotation marks omitted); see also Schwartz v. Brownlee, 482 S.E.2d 827, 829 (Va. 1997) (explaining that "[w]hen there is no substantial conflict in the facts and circumstances disclosed by the evidence, it becomes a question of law to be decided by the court whether one party was the agent of another" (alterations and internal quotation marks omitted)).

There can be no doubt as to the existence of an agency relationship after the point that the parties entered into the Consulting Agreement. At that point, Bocek was paying JGA for Amato's services. Amato himself conceded that he understood that, at least initially, "what [he was] to be doing, [he would be] doing it for Dr. Bocek" and "acting subject to his instructions and his directions." J.A. 88. And, the agreement plainly established JGA's authority to act as his agent with regard to the lenders from whom Bocek sought financing.

It is certainly true, as the district court observed, that the parties entered into the Consulting Agreement with the intention that JGA would provide services relating to the formation of a new medical practice. However, five days after entering into that agreement, Bocek raised the possibility that

17

he might purchase ACC or that Amato might advise him or assist him in so doing. Amato immediately undertook to help Bocek determine the feasibility of the idea, including communicating with the trustee responsible for the sale and obtaining information about ACC's assets on Bocek's behalf. The only conclusion to be drawn from the record is that the parties both assented to JGA's acting as Bocek's agent in their dealings with the Estate selling ACC just as they had contemplated JGA representing Bocek to possible lenders.

Indeed, Amato himself testified that, at least initially, he was "doing the due diligence work regarding ACC at Dr. Bocek's request" pursuant to their agreement "to help [Bocek] with the medical practice." J.A. 104-05. See also J.A. 221 (language in Consulting Agreement stating that JGA, in addition to the services specified in the agreement, would "render such other services as may be agreed upon by" Bocek and JGA). And it is undisputed that Amato reported to Bocek regularly regarding his progress and billed Bocek for work regarding the possible purchase of ACC. It is also undisputed – and unsurprising – that Bocek continued to provide instruction to Amato regarding the work that Amato was performing on his behalf. That instruction included Bocek's directive that Amato not disclose his identity in the course of Amato's communications with ACC.

18

When the defendants shifted toward actually negotiating for the purchase of ACC, the parties' communications and conduct continued to point unmistakably toward the conclusion that Amato's actions with regard to that purchase were made in the context of the parties' established plan for Amato to act on Bocek's behalf to obtain the practice for Bocek. Although possible issues regarding Bocek's ability to come up with sufficient capital complicated the question of how the deal would be structured, the parties' communications and conduct unmistakably demonstrated that their work, including Amato's placing of a closed bid to purchase ACC, continued to be part of the defendants' efforts on Bocek's behalf to obtain the practice for Bocek, as the parties' emails of December 23, 27, and 28, 2010, plainly reflect.

The only reasonable inference that can be drawn from all of these facts, none of which are in dispute, is that Amato and Bocek, by their conduct and communications with each other, both assented to Amato's acting on Bocek's behalf and subject to his control in helping Bocek evaluate the feasibility of purchasing ACC and in working toward actually obtaining the practice for Bocek. And this fact, in turn, establishes the legal conclusion that Amato was acting as Bocek's agent.

The district court's analysis notwithstanding, there was no reason that Bocek was required to show that an agency

19

relationship was established by a separate contract in order to show that the parties both assented by their conduct to Amato's acting as Bocek's agent regarding Bocek's possible purchase. Cf. Bloxom v. Rose, 144 S.E. 642, 644 (Va. 1928) (concluding that evidence was sufficient to support finding of agency even though facts did not suggest that the parties had agreed to any specific contractual terms). That the parties never reached a meeting of the minds as to the manner in which ACC would ultimately be transferred to Bocek simply does not bear on the question of whether the parties had both assented to the agency relationship.

Moreover, the undisputed facts proven at trial clearly demonstrate that this situation is one in which "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." H-B Ltd. P'ship, 257 S.E.2d at 773. Bocek paid JGA – and JGA accepted payment – for Amato's expertise and assistance in determining the worth of a business opportunity that Bocek had identified for Amato for that purpose. Under such facts, the law precludes Amato in equity and good conscience from appropriating the opportunity for himself once he determined that it in fact carried with it the very potential for substantial profit that Bocek had hoped it would. See Bocek, 537 F. App'x at 176-

20

77; id. at 180 (Niemeyer, J., concurring in part and concurring in the judgment) ("The law would be a buffoon if it allowed JGA to take Bocek's opportunity simply by ending the agency relationship and proceeding thereafter in furtherance of its own interest.").

The defendants take the position that at some point after their initial work regarding the ACC purchase, they ceased acting on Bocek's behalf. However, as we explained in our prior opinion, once the defendants' duty of loyalty toward Bocek arose, they could not extinguish it simply by terminating the agency relationship. See Bocek, 537 F. App'x at 177 (Traxler, C.J.); id. at 179-80 (Niemeyer, J., concurring in part and concurring in the judgment).

For all of these reasons, we hold as a matter of law that Bocek proved that the defendants breached their fiduciary obligations to Bocek by appropriating the ACC opportunity for themselves.[3] In so doing, we certainly acknowledge the district

---

[3] In the prior appeal, Bocek appealed the grant of summary judgment against him, and we determined that the facts alleged, if proven at trial, would establish that the defendants breached their fiduciary obligations to Bocek. We were not called upon to decide whether the evidence was sufficiently one-sided that Bocek would have been entitled to summary judgment on that issue had he sought it. See Appellees' brief at 27 (noting "the dissimilar postures between the First Appeal and the instant appeal" in that the facts that Bocek claims he proved at trial were "mere allegations" in the prior appeal).

court's role as the trier of fact as well as the deference we must afford the district court's factual findings. But the material facts regarding the parties' conduct are undisputed (and the facts regarding the parties' secret, subjective intentions are immaterial to the agency issue). Whether those undisputed facts establish the agency relationship is a legal question for us to decide, see Acordia of Va. Ins. Agency, 560 S.E.2d at 250, and for the reasons we have explained, we conclude that they did establish the agency relationship.

                                    B.

Bocek also argues that the district court erred in concluding that even assuming that the defendants' appropriation for themselves of the ACC opportunity constituted a breach of their fiduciary obligations to Bocek, Bocek failed to prove any damages from the breach. We agree.

In Bocek's Amended Complaint regarding this cause of action he requested, among other remedies, money damages in the amounts of "the difference between the purchase amount set forth in the Asset Purchase Agreement and the true value of ACC's assets on [the] date of the Asset Purchase Agreement or, in the alternative, at the time that JGA transferred or assigned its rights in the Asset Purchase Agreement to A2." Verified Amended Complaint 33, Docket No. 66, Civil Action No. 1:11-cv-00546 (E.D. Va. July 22, 2011). He also requested the "profits that

22

Bocek would have derived as the owner of ACC's assets . . . for such period of time in the future as can be calculated to a reasonable degree of probability." Id.

To recover damages for lost profits, a plaintiff "ha[s] the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery." Banks v. Mario Indus. of Va., Inc., 650 S.E.2d 687, 696 (Va. 2007) (internal quotation marks omitted).

Bocek testified that when he left ACC, he was earning a salary of $450,000 per year and that the practice would have paid him at least that amount in annual salary had he returned as an owner. He also testified that that salary was within the range that a doctor with Bocek's research experience and years of practice would be expected to earn. He testified that having started a new medical practice in 2011 when he was not able to purchase ACC's assets, he had not yet been able to turn a profit, but that he hoped to break even with the new business by 2015 and proceed from there.

Bocek also presented the report of Certified Public Accountant Joseph S. Estabrook, who serves as a consultant in the areas of business valuation, litigation, and dispute resolution. Examining ACC's financial documents through May 2011, Estabrook conducted a detailed analysis and projected the

23

practice's net income would steadily increase from $478,271 in 2012 to $559,509 in 2016. Based on this and other factors, Estabrook determined that ACC's fair market value as of June 22, 2011, was $2,232,000.[4]

On the other hand, Amato testified that although ACC had been profitable in the past, under A2's ownership, the practice was not profitable in the tax years 2011 and 2012. He testified that on A2's 2011 tax return, "after taking into consideration . . . interest, taxes, depreciation, and amortization," A2 reported a loss of about $2,000. J.A. 67. Amato also testified that near the end of 2011 an insurance audit revealed that the billing practices of the prior management were inconsistent with what the insurance companies required. He testified that "there was going to be a drop of as much as 40 percent of top-line revenue because [A2] sought to bring in proper billing as opposed to what was done previously." J.A. 68. And, he testified that A2 reported a loss of about $152,000 on its 2012 tax return.

---

[4] Although A2 actually purchased ACC's assets for $1,000,000, Estabrook opined that "due to the financial difficulties experienced by the Valentine Estate, coupled with the fact that the Estate apparently did not employ traditional marketing and sales efforts to maximize the sales price of the practice, the offers and ultimate sales price for the practice was substantially and artificially depressed." J.A. 365.

Addressing the damages issue, the district court concluded (1) that the direct and proximate cause of Bocek's failure to collect an income or prospective profits was Bocek's termination from ACC and the conduct that precipitated it, and (2) that A2 had not earned any profits since purchasing ACC that Bocek would have earned had he purchased the business. Regarding the second point, the district court referenced the tax losses A2 reported for 2011 and 2012.

We conclude that neither of these reasons supported the conclusion that Bocek had failed to prove damages. First of all, whether Bocek was to blame for being terminated from his position at ACC simply has no bearing whatsoever on his entitlement to damages. Regardless of whether he harmed himself financially by taking actions that brought about his termination at ACC, any such conduct occurred prior to his dealings with JGA. Bocek sought to prove that purchasing ACC's assets was an opportunity for him to turn his financial fortunes around and that the defendants harmed him by appropriating that opportunity for themselves.

Additionally, the fact that A2 reported losses on its 2011 and 2012 tax returns also does not show that Bocek would not have profited in those years from his purchase of ACC's assets. First, even assuming arguendo that the practice's revenues did not exceed its expenses in those years, there was no evidence

25

that the practice was not able to pay its expenses, including doctor salaries. And one would certainly expect that the reintroduction of Bocek to the practice would have reduced the practice's salary expenses for other physicians, increased its ability to generate revenue, or both. In this regard, Bocek testified that when he was working with ACC, he "carried 40 percent of the load of the practice because [he] was the only board-certified allergist and the only full-time doctor." J.A. 175. Accordingly, the fact that A2 reported tax losses without Bocek does not undercut Bocek's claim that had he been back at ACC practicing medicine, the practice would have generated the revenue necessary to at least provide him with the income to which he was accustomed.[5]

In light of these problems with the district court's analysis, we conclude that its finding that Bocek failed to prove damages from the defendants' alleged breach of their fiduciary obligations was clearly erroneous and cannot serve as a basis for affirming the judgment in the defendants'

---

[5] Moreover, Amato himself conceded that the calculation of A2's tax losses included "paper losses" such as amortization and depreciation that offset revenue that the business generated. And, Amato conceded that he drew $75,000 from A2 as salary in 2011.

26

favor.[6]  See Wileman v. Frank, 979 F.2d 30, 38 (4th Cir. 1992)

("In the unusual case where the district court['s] . . .

reasoning from the evidence adduced is so flawed as to

constitute clear error, we, as a court of appeals, have a

responsibility to correct that error.).  We therefore reverse

the judgment in favor of the defendants and remand for entry of

judgment in favor of Bocek on the issue of liability and for a

new trial on the issue of what, if any, remedies Bocek is

entitled to as a result of the defendants' breach.[7]

---

[6]     The defendants maintain that Bocek's damages theories
that involve him returning to practice at ACC do not account for
the facts that (1) "he was prohibited from trespassing on the
four ACC locations in Maryland – pursuant to non-trespassing
orders issued by the Montgomery County, Maryland Department of
Police," and (2) the entity that owned ACC could face liability
if it hired him with knowledge of his prior history.  Appellees'
Brief at 32.  However, there was no basis for concluding that if
Bocek owned or partly owned the practice, he still would have
been prohibited from entering ACC's premises.  There is likewise
no evidence suggesting that fear of negligent hiring liability
would have affected Bocek's decisions regarding what role he
would assume.

[7]     We offer no view regarding Bocek's entitlement to any
remedy he has requested, including the imposition of a
constructive trust.

    We note that Bocek requests that this case be assigned to a
different district court judge on remand.  We have previously
reviewed such requests by employing a three-factor test:

    (1) whether the original judge would reasonably be
    expected upon remand to have substantial difficulty in
    putting out of his or her mind previously expressed
    views or findings determined to be erroneous or based
    on evidence that must be rejected,

(Continued)

27

III.

For the foregoing reasons, we reverse the judgment in favor of the defendants and remand for entry of judgment in favor of Bocek on the issue of liability and for a new trial on the issue of what, if any, remedies Bocek is entitled to in light of the defendants' breach of their fiduciary obligations to him.

REVERSED AND REMANDED

---

(2) whether reassignment is advisable to preserve the appearance of justice, and

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

United States v. Guglielmi, 929 F.2d 1001, 1007 (4th Cir. 1991) (quoting United States v. Robin, 553 F.2d 8, 10 (2d Cir. 1977)). Having considered these factors, we conclude that reassignment would not be appropriate here.

WILKINSON, Circuit Judge, concurring:

The reasoning in my earlier dissent, Bocek v. JGA Assocs., LLC, 537 F. App'x 169, 180-82 (4th Cir. 2013) (Wilkinson, J., concurring and dissenting), now being precluded by the law of the case, I concur in the majority's opinion.